OPINION OF THE COURT
Lewis R. Friedman, J.[1]
In this motion defendants (London Reinsurers) seek the return of certain documents that they inadvertently produced during the massive document production in this case. The London Reinsurers contend that the documents are protected by the attorney-client privilege or are attorney work product. There is also the claim that certain of the documents are irrelevant to this case. Plaintiff (Aetna) argues only that the documents are not privileged or entitled to some form of work product protection. Thus the court need not address the question of whether there was waiver of the privilege by the “inadvertent” disclosure (see, Blair Communications v Reliance Capital Group, 182 AD2d 578, 579 [1st Dept 1995]). The only question for decision is whether the London Reinsurers have established that the documents should not have been produced.[2]
It appears that originally over 1,300 pages of material were inadvertently produced. Aetna returned about 730 pages, leav *607 ing 44 documents,[3] referred to as exhibits 10 through 53 of the moving affidavits, consisting of about 600 pages as the subject of this motion. Prior to oral argument Aetna agreed to return two of the documents (exhibits 45, 53) and, at argument the court directed the return of two others (exhibits 43, 44). Thus this decision will deal with the remaining documents, which have been provided for the court’s in camera review. The court has carefully reviewed the documents.
The issues in this case arise from environmental claims made against Aetna by a major chemical company. Aetna had written general liability and excess insurance policies in the 1960’s which arguably covered environmental damage claims. The London Reinsurers through blanket treaties reinsured a portion of the pre-1970 through 1971 risks. The company had asserted massive potential liability for environmental damage to governmental agencies and third parties. Aetna’s insured claimed that there were “occurrences” covered by Aetna at more that 150 waste sites in the United States. In 1985, based on claims that there could be up to $60 million in liability by Aetna per “occurrence”, the insured sued Aetna, which had denied coverage. The litigation continued for nearly a decade. In 1995 just prior to trial Aetna settled the claims. In this action Aetna is seeking to allocate a portion of the total settlement, about 9%, to the London Reinsurers. In the decision and order dated June 9, 1997 this court granted partial summary judgment to Aetna, holding that the London Reinsurers could not challenge Aetna’s decision to settle with its insured. Aetna has made a motion for summary judgment on the remaining questions impacting the allocation of losses to the London Re-insurers. This court had directed that certain discovery be conducted notwithstanding the already pending summary judgment motion (CPLR 3214). Aetna claims that the documents that are involved in this motion are relevant and material to its summary judgment motion.
The majority of the documents at issue (exhibits 12-14, 17-28) are summaries, in the nature of minutes of meetings, often referred to as “workshops”, of the ECRG, the Environmental *608 Claims Reinsurance Group. The ECRG consisted of representatives of various Lloyd’s underwriters and other London-based insurance companies, which referred to themselves as the “London Reinsurers”, not to be confused with the reinsurers which have signed the various treaties at issue in this case. Some of the persons present at the ECRG meetings represented reinsurers involved in this case, while most are not involved here. The documents at issue were the typed minutes of the meetings which were sent to some of the participants with instructions to have them delivered to the others who had been present.
Either an American attorney or an English solicitor was present at each of the meetings in a stated effort to insure that privilege would attach to whatever was said during the meetings (see, exhibit 23). Nearly all of the minutes, which were taken by counsel, begin with the notation that an attorney was present “and the discussions were intended to be privileged and confidential” and that notes of the participants “should be clearly marked ‘privileged and confidential’ to protect them from inadvertent disclosure, possibly in connection with litigation” (see, e.g., exhibits 19, 17, 22, 26). The minutes themselves are marked “privileged and confidential attorney-client COMMUNICATION AND ATTORNEY WORK PRODUCT” Or a similar notation (exhibits 10-28).
It is well settled that in order for a communication to be absolutely privileged, a confidential communication between client and attorney, in the course of a professional relationship, must be made for the purpose of seeking or providing legal advice or assistance and the communication itself must have been primarily or predominantly of a legal character (see, Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d 371, 377-378 [1991]; see, Restatement [Third] of Law Governing Lawyers § 122 [Proposed Final Draft No. 1, 1996] ).[4] The mere presence of counsel cannot be used “to seal off disclosure” (Rossi v Blue Cross & Blue Shield, 73 NY2d 588, 593 [1989]). It is established that communications to or from counsel need not contain solely legal research if it integrates facts and the lawyer’s legal advice *609 (Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d, at 379) or includes “primarily or predominantly” legal communications (Rossi v Blue Cross & Blue Shield, 73 NY2d, at 594). Of course, this court agrees with the long-held conclusion that there is no privilege where the attorney is present at a meeting as “a mere scrivener” and there is no consultation for legal advice (Pollock v United States, 202 F2d 281, 286 [5th Cir 1953]).
The courts have generally held that the use of confidentiality labels on documents is not conclusive on the court’s analysis (see, California Union Ins. Co. v National Union Fire Ins. Co., 1989 US Dist LEXIS 4996, *4 [ND NY, Apr. 27, 1989, McAvoy, J.]; American Health Sys. v Liberty Health Sys., 1991 US Dist LEXIS 18368, *6-7 [ED Pa, Dec. 21, 1991, Naythons, J.]). Since the Court of Appeals has made it clear that the label for retention of counsel is not binding (Spectrum Sys. Intl. Corp. v Chemical Bank, supra, 78 NY2d, at 379-380), this court concludes that it is not bound to accept the label counsel placed on the documents. Thus the court has reviewed the minutes, as suggested in Spectrum, to see if they satisfy the test for attorney-client privileged communications.
The court’s review of the voluminous minutes makes it clear beyond question that the minutes reflect an industry-wide group of the leading London reinsurance underwriters seeking economic solutions to the problems created by potentially huge losses to direct insurers in the United States which had ceded policies pursuant to blanket reinsurance treaties. Or, in alternative phrasing, they were seeking to keep environmental losses on this side of the Atlantic. They were aware of potential antitrust problems (exhibit 23) but, surprisingly, the minutes reflect that they did not ask for any advice from counsel in attendance on the subject. The subject of most of the meetings was the interpretation of the various treaty clauses that might be invoked by the primary insurers. At first blush this appears to be primarily a legal question. However, the court’s review shows that the participants did not ask counsel for a legal analysis of the clauses, no doubt since the varying theories of interpretation were well known to this senior group of environmental reinsurance experts. Rather, the participants, on behalf of the London reinsurance market, sought to find economic solutions that would benefit the entire *610 London market as a whole.[5] For example, in the meeting discussing whether reinsurers should pay for costs incurred in declaratory judgments there is not one word of discussion about the meaning of the clauses involved. Rather, the 11 pages of minutes reflect lengthy discussions by the underwriters of the strategic or “commercial” consequences in refusing to pay United States ceding companies’ declaratory judgment expenses. The participants were arguing the merits of supporting efforts that might result in valid defenses to underlying claims, as opposed to refusing those expensive payments only to be confronted with claims to pay for settlements, which might not be the result of utmost good faith with respect to the reinsurers (exhibits 26, 27). The court does not find that even the specific example, referred to by both sides to show the participation by counsel in the midst of one of the meetings, establishes that the comments of counsel related to issues that had economic significance. When one nonattorney ECRG participant noted that a reason had to be given for each rejection and that “this enables cedents to refine future presentations” the recorded comment of counsel was only that since proofs of loss were increasingly being submitted “this meant that the position of Underwriters on the various issues would be established and that Underwriters would find these positions difficult to modify in the future” (exhibit 18, ECU 3908). That is hardly “legal advice.”
Aetna also contends that there are other reasons why it is impossible for the court to conclude that there were attorney-client relations between the attorneys and the members of ECRG. Aetna observes that the ECRG has stated to all of the London reinsurers, including some of the entities defined as the London Reinsurers in this case, that it “has been monitoring this subject [Reinsurance Pollution Claims] for the Market since August 1989.” References throughout the minutes are to market-wide problems. Aetna argues that counsel cannot claim a privilege with respect to an entire market composed of would-be competitors. Aetna concludes that consultations between those governing the entire London reinsurance market cannot be protected from disclosure. The London Reinsurers appear to rest their claims on the concept of a “joint defense” or “common interest” privilege. The New York cases on the subject are not clear or dispositive.
*611 The principle underlying the “common interest” privilege is that it is an exception to the traditional rule that the presence of a third party, not an agent or employee of counsel, at a communication between counsel and a client is sufficient to deprive the communication of the confidentiality which is one of the pillars of the privilege (see, e.g., People v Harris, 57 NY 335, 343 [1982]; People v Buchanan, 145 NY 1, 26 [1895]). The New York criminal cases, following Federal authorities (United States v McPartlin, 595 F2d 1321 [7th Cir 1979]; Hunydee v United States, 355 F2d 183 [9th Cir 1965]), have accepted a limited exception to the “third person present” rule where the persons present are criminal defendants and their counsel engaged in preparing a defense to a pending criminal charge against each of them (People v Osorio, 75 NY2d 80, 85 [1989] [“common defense”]; People v Borcsok, 107 AD2d 42, 44 [2d Dept 1985] [“in the furtherance of a common defense”]; People v Pennachio, 167 Misc 2d 114,115 [Sup Ct, Kings County 1995] [“ongoing common enterprise”, “joint defense effort or strategy”]; People v Calandra, 120 Misc 2d 1059, 1061 [Sup Ct, NY County 1983] [“common goal or interest”]; cf., Matter of Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974, 406 F Supp 381, 387-388 [SD NY 1975]). The theory of those cases is that an extension of the privilege is necessary to permit a joint defense to the common charges and that a defendant and counsel have the expectation that their confidences will be kept by the codefendants and their counsel.
The New York cases have not clearly extended the common defense exception to civil cases. The Federal courts that have applied the New York rules of evidence have opined that the New York courts would probably extend the “common interest” privilege to civil cases (see, In re Megan-Racine Assocs., 189 Bankr 562, 571 [ND NY 1995]; In re Subpoena Duces Tecum Served on N. Y. Mar. & Gen. Ins. Co., 1997 WL 599399, 4 [SD NY, Sept. 26, 1997, Dollinger, J.]; cf., Magnaleasing, Inc. v Staten Is. Mall, 76 FRD 559, 563, n 6 [SD NY 1977]). This court agrees with that conclusion. The principles which warrant an extension of the privilege to codefendants facing criminal charges apply with equal force to those parties facing common problems in pending or threatened civil litigation (see, Parisi v Leppard, 172 Misc 2d 951, 956 [Sup Ct, Nassau County 1997]).
The rule is easy to apply to parties with a common legal interest in an already pending case. However, the broad discussion in Parisi (supra) does not advance the inquiry in cases *612 where the litigation is merely threatened or impending in a civil context. Since the parameters of a common problem are often not defined until actual litigation ensues, the “common interest” privilege could easily be used to protect communications with counsel involving merely common commercial interests. The attorney-client privilege is one of the few mechanisms which Anglo-American law permits to thwart proper discovery and the use of relevant and material information. Accordingly it is subject to severe limitations and a “narrow construction”. Thus any “common interest” privilege must be limited to communication between counsel and parties with respect to legal advice in pending or reasonably anticipated litigation in which the joint consulting parties have a common legal interest. The attorney-client privilege, even as expanded by the “common interest” exception, may not be used to protect communications that are business oriented or are of a personal nature. (In re Megan-Racine Assocs., supra, 189 Bankr, at 572; In re Subpoena Duces Tecum Served on N. Y. Mar. & Gen. Ins. Co., 1997 WL 599399, 4, supra; Matter of Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974, supra, 406 F Supp, at 387; Restatement [Third] of Law Governing Lawyers § 122 [1], comment e, Reporters Note comment e [Proposed Final Draft No. 1, 1996]).
The parameters of what constitutes an adequate “common legal interest” so as to implicate the “common interest” privilege is less than clear. For example, the Bankruptcy Court in In re Megan-Racine Assocs. (supra) adopted the rule that the common interest privilege would apply where parties have been, or may potentially become, coparties to a litigation. But the predominant reasons for that formulation were considerations that are unique to a bankruptcy setting. The court in Bank of Brussels Lambert v Credit Lyonnais (Suisse) (160 FRD 437, 448 [SD NY 1995]), applying Federal evidentiary law, applied a far broader standard that permits a common interest privilege where there is a “coordinated legal strategy”. This court does not find that the limited New York authority on the subject permits the carving out of a large class of communications between potential parties so as to immunize their communications between themselves and counsel for other parties. That would be inconsistent with the narrow claim of the attorney-client privilege (Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d 371, 376-377, supra) and that “its scope is limited to that which is necessary to achieve its purpose” (Rossi v Blue Cross & Blue Shield, 73 NY2d 588, 593, supra; Matter *613 of Priest v Hennessy, 51 NY2d 62, 68 [1980]; Matter of Jacqueline F., 47 NY2d 215, 219 [1979]). Thus this court will not apply the “common interest” privilege except where the underlying circumstances require that communications be protected, as with ordinary attorney-client matters, and the common legal interest impacts potential litigation against all of the participants.
In the circumstances of this case the court has no difficulty in drawing the line so as to conclude that the “common interests” were nearly exclusively of a commercial nature. The minutes establish that the commercial interest in maintaining the financial viability of the London reinsurance market, including obtaining new business from cedents while keeping the environmental claims at bay, was the reason for the meetings and the recorded discussions. There was little if any legal advice sought even though the underlying questions were the interpretation of clauses in reinsurance treaties. Clearly the ECRG members were not expecting this or any other specific litigation when these meetings occurred in 1992 through 1994. Indeed it is hard for a court even to characterize the attorneys who attended as counsel for any client other than the London reinsurance market as a whole. At times the lawyers are described as counsel to ECRG. If that is so, there is no way that ECRG could have become a party to any litigation since it never subscribed to any reinsurance treaties. Moreover, all of the members did not sign any one of the blanket treaties at issue. The members had interests that clearly diverged from each other since the treaties with each of the members differed in some respects and the strategies discussed would, if adopted on behalf of the “market”, work to the benefit of some members and against others. As counsel for Aetna points out the theories advanced by the London Reinsurers in the summary judgment motion in this case are contrary to the views of the majority of the ECRG members, precisely because the treaties at issue produce a better result for these reinsurers than the alternative theories advanced during the ECRG meetings. For this court to adopt the argument of the London Reinsurers in this case would be to protect market-wide commercial planning, which might impact antitrust issues, merely because counsel to “the market” is in attendance.
The law is well settled that the mere existence of the cooperation agreements signed by the ECRG cannot create a privilege that otherwise does not exist. A private agreement by the parties to protect communications cannot create a privilege (see, *614 In re Subpoena Duces Tecum Served on N. Y. Mar. & Gen. Ins. Co., 1997 WL 599399, 4, n 4, supra). The court cannot find that the “cross-consultation” agreements in this instance help the London Reinsurers establish that the minutes are confidential documents that should be privileged.
On the other hand the documents reflecting drafts or final versions of “cross-consultation” agreements, retainer agreements with counsel and documents reflecting methods of paying counsel (exhibits 34-42, 47, 48) are clearly matters that come within the “common interest” privilege, no matter how defined. Those documents must be returned.
The court finds that the minutes of the ECRG meetings are not privileged. The London Reinsurers contend that if the minutes are not privileged, they should be subject to work product protection pursuant to CPLR 3101 (c) or (d) (2). Plainly the minutes do not reflect the note-taking attorneys’ interviews with witnesses, “mental impressions, personal beliefs, case evaluation or trial strategy” which would have an absolute privilege from production under CPLR 3101 (c) (Feig v Lenox Hill Hosp., 167 Misc 2d 42, 46 [Sup Ct, NY County 1995]). The notes reflect what each of the participants said and were subject to revision for accuracy. The New York work product rule “has been uniformly given a narrow construction by the courts” (Chemical Bank v National Union Fire Ins. Co., 70 AD2d 837, 838 [1st Dept 1979]). Nor are the minutes material “prepared in anticipation of litigation or for trial” that are subject to a conditional privilege under CPLR 3101 (d) (2). Plainly litigation was the last thing counsel anticipated as a result of the business discussions that are recorded.
The court finds that the minutes of the ECRG meetings are not privileged or protected as work product. Thus the motion to require the return of the minutes is denied.
Plainly the lists of witnesses (exhibits 15, 16) need not be returned. The court does not find that any privilege or the work product exception attaches to them. On the other hand it is self-evident that the document (exhibit 29) retaining a consultant to assist counsel in the determination of the legal interpretation of the “site clause” is a communication subject to the attorney-client privilege, as is the transmission of the consultant’s findings to the ECRG members (exhibit 30). The listing of topics for consideration at ECRG meetings and counsel’s analysis of relevant cases (exhibits 10, 11, 46) are privileged. The document that appears to discuss the retention *615 of counsel as well as asbestos, as opposed to environmental, related matters (exhibit 33) should be returned.
The motion is granted to the extent indicated.

. The decision was signed, pursuant to CPLR 9002, by Justice Stephen G. Crane, after the death of Justice Friedman.

. The court is not aware of any rule that would require the return of inadvertently produced totally irrelevant material. Neither of the parties have briefed the question. There are several documents that appear to have absolutely nothing to do with the case (exhibits 48-53). The court directs their return as their inadvertent production should not result in giving Aetna’s counsel material that is not responsive to any discovery demand and that has nothing to do with this case.

. For convenience in this decision the court generally refers to the documents by the exhibit numbers used to annex the documents to the moving affidavit. To the extent necessary the court will refer to the Bates numbers preceded by “ECU” stamped on the documents. The court notes that two of the documents have been annexed twice (exhibits 20, 21 and 23, 24), even though both copies bear different Bates numbers. Accordingly they are only referred to once in this decision.

. The parties appear to agree that the relevant privilege law is that of New York, rather than of England, where the meetings which are the subject of the communications took place and of the documents at issue. In the absence of any disagreement from counsel on the subject, the court will follow the parties’ decision to apply New York law. The English rule, which is apparently similar, appears also to require that legal advice be a predominate purpose of the communication (see, Waugh v British Rys. Bd., 1980 AC 521 [House of Lords]).

. European reinsurers were not invited to the meetings, although there was extensive discussion on the subject. The ECRG members at some points sought to distinguish between European coreinsurers, who might be invited on a limited basis, and the numerous European retrocessionaires.