GULF ISLANDS LEASING,
INC., Plaintiff,

v.

BOMBARDIER CAPITAL,
INC., Defendant.

Bombardier Capital, Inc., Counterclaim
Plaintiff,

v.

Gulf Islands Leasing, Inc., Counterclaim
Defendant.

Bombardier Capital, Inc., Cross–
Claim Plaintiff,

v.

Andrew L. Evans and Ann L. Evans,
Cross–Claim Defendants.

No. 02 Civ. 2839(WHP)(GWG).

United States District Court,
S.D. New York.

May 29, 2003.

William B. Fleming, Gage Spencer & Fleming, LLP, New York City, Robert B. Lovett, Jennifer L. Conrad, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Gulf Islands Leasing, Inc.

Patrick P. Salisbury, Salisbury & Ryan LLP, New York City,for Bombardier Capital, Inc.

*OPINION AND ORDER*

GORENSTEIN, United States Magistrate Judge.

Bombardier Capital, Inc. ("Bombardier Capital") has moved for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure with respect to a number of documents listed on its privilege log. Originally, Bombardier Capital moved for a protective order solely on the ground that the documents were protected by the joint defense or common interest rule, an extension of the attorney-client privilege. After a telephone conference on February 3, 2003, however, Bombardier Capital was granted leave to brief its assertion that the materials were also protected by the work-product doctrine. Gulf Islands Leasing, Inc. ("Gulf") has opposed Bombardier Capital's motion for a protective order. For the reasons stated below, Bombardier Capital's motion is denied.

## I. *INTRODUCTION*

### A. *Factual History*

Bombardier Capital and Bombardier Aerospace Corporation ("Bombardier Aerospace") are separate corporations that are each wholly-owned subsidiaries of Bombardier Inc. *See* Memorandum of Law of Bombardier Capital, Inc. in Support of its Assertion of the Joint Defense Privilege, dated December 5, 2002 ("Def.Mem."), at 1. Bombardier Inc. is in the business of manufacturing aircraft. *Id.* Bombardier Aerospace manages and sells "fractional ownership interests" of aircraft manufactured by Bombardier Inc. *Id.* A fractional ownership interest allows the buyer to use a Bombardier airplane for a period of time and have the plane serviced by Bombardier Aerospace. *Id.* Bombardier Capital offers financing for the sales of Bombardier Inc. aircraft, including sales of fractional ownership interests. *Id.*

On July 31, 2000, Gulf purchased a 50% fractional ownership interest in a Bombardier Global Express corporate aircraft. *See* Gulf Island Leasing, Inc.'s Memorandum of Law in Opposition to Bombardier Capital, Inc.'s Assertion of the Joint Defense Privilege, dated December 13, 2002 (Docket # 25)

("Pl.Mem."), at 1. Gulf executed a Purchase Agreement and a Management Agreement (collectively the "Aerospace Agreements") with Bombardier Aerospace. The Purchase Agreement governed the terms of sale of the interest in the aircraft. *See* Purchase Agreement, dated July 31, 2000 ("Purchase Agreement") (reproduced in Declaration of Patrick P. Salisbury, dated December 5, 2002 ("Salisbury Decl."), Ex. C). The Management Agreement governed the use and management of the aircraft. *See* Management Agreement, dated July 31, 2000 ("Management Agreement") (reproduced in Salisbury Decl. Ex. D). Gulf paid $19,600,000 for its ownership interest. *See* Def. Mem. at 1. To finance its purchase of the airplane, Gulf obtained a loan of $16,339,488.50 from Bombardier Capital. This loan transaction is reflected in a Loan Agreement and a Security Agreement (collectively the "Capital Agreements"). *See id.;* Loan Agreement, dated July 31, 2000 ("Loan Agreement") (reproduced in Salisbury Decl. Ex. A); Security Agreement, dated July 31, 2000 ("Security Agreement") (reproduced in Salisbury Decl. Ex. B).

While the agreements with Bombardier Capital and Bombardier Aerospace were separate, a default by Gulf under the Aerospace Agreements would have consequences under the Capital Agreements, and vice versa. For example, upon a default by Gulf under the Management Agreement, Bombardier Capital could foreclose upon and sell the airplane. *See* Management Agreement, § 10. Other sections in the Aerospace and Capital Agreements give both Bombardier Aerospace and Bombardier Capital rights upon a default by Gulf on either set of agreements. *See* Purchase Agreement, §§ 4(a)–(c); Security Agreement, §§ 8(a)–(c).

Soon after the purchase, Gulf became dissatisfied with Bombardier Aerospace's performance. Ultimately, Bombardier Aerospace filed a lawsuit against Gulf in the United States District Court for the Northern District of Texas alleging breach of contract. *See* Complaint, filed January 12, 2001 (reproduced in Affidavit of Jennifer L. Conrad in Support of Gulf Island Leasing, Inc.'s Memorandum of Law in Opposition to Bom-

bardier Capital, Inc.'s Assertion of the Joint Defense Privilege, dated December 13, 2002 (Docket # 26) ("Conrad Aff."), Ex. 7). Several days later, Gulf filed suit against Bombardier Aerospace in Washington state court also alleging breach of contract. *See* Complaint, dated January 22, 2001 (reproduced in Conrad Aff. Ex. 6). While the lawsuits between Gulf and Bombardier Aerospace proceeded, Gulf continued to make payments to Bombardier Capital under the Capital Agreements. *See* Deposition of Andrew L. Evans (undated) (reproduced in Conrad Aff. Ex. 8), at 38. Bombardier Capital was not a party to either lawsuit.

During 2001, Gulf and Bombardier Aerospace engaged in settlement negotiations and ultimately reached a settlement that was signed on December 21, 2001. Under the terms of the Settlement Agreement (also referred to as the "repurchase agreement"), Bombardier Aerospace agreed to repurchase Gulf's fractional interest in the airplane. *See* Confidential Settlement Agreement, dated December 21, 2001 ("Settlement Agreement") (reproduced in Conrad Aff. Ex. 10), § 5.3(b). Bombardier Aerospace agreed to pay Gulf the fair market value of Gulf's fractional interest in the airplane less the amount Gulf owed under the Capital Agreements, which Bombardier Aerospace would pay directly to Bombardier Capital on Gulf's behalf. *See id.* Thus, after Bombardier Capital was paid the portion it was owed, Bombardier Aerospace was to pay the remainder—minus a management fee of $165,368.94, *see id.,* § 5.3(a)—to Gulf. *See id.,* § 5.3(b).

Bombardier Capital was not part of the negotiations of the settlement with Gulf although, as is discussed more fully later, Bombardier Aerospace and Bombardier Capital had communications regarding the transaction—both before and after the Settlement Agreement was signed. Gulf contends that Bombardier Aerospace told Gulf that Bombardier Capital would play no part in the Settlement Agreement. *See* Pl. Mem. at 3. The Settlement Agreement itself provides that it shall not "affect the rights of Gulf Islands with regard to Bombardier Capital, Inc. ('BCI') and no terms of this agreement

shall be construed to include BCI or affect its relationship with Gulf Islands unless it is specifically referred to therein." Settlement Agreement, § 2.4. Bombardier Capital was specifically exempted from the provision of the Settlement Agreement releasing the parties from liabilities, *id.*, § 3.1, and the requirement that mutual releases be executed. *Id.*, § 7.

One issue that arose as a result of the settlement was the extent that Gulf would be responsible for "breakage costs," which Bombardier Capital defines as a charge to compensate for "the loss [Bombardier Capital] suffered when Gulf prepaid the loan as a result of the attendant early termination of an interest rate swap transaction that [Bombardier Capital] entered into relating to the Gulf loan." Def. Mem. at 5. Also at issue was a "make-whole payment," which Bombardier Capital defines as "the prepayment fee required to make [Bombardier Capital] whole for a 'loss of yield' on the loan due to early repayment of the loan." *Id.*

Bombardier Capital contends that, in connection with the repurchase, it agreed to waive "breakage costs" due from Gulf but only in exchange for receiving the "make-whole payment" allegedly owed by Gulf under the Capital Agreements. *See* Def. Mem. at 5. Gulf disputes that it was obligated to pay the "make-whole payment." *See* Pl. Mem. at 3–4. On February 1, 2002, pursuant to the Settlement Agreement, Bombardier Aerospace transferred $16,775,053.58 to Bombardier Capital—an amount that included a "make-whole payment" of $1,002,235.62. *See* Bombardier—Gulf Islands Leasing, Inc., Closing Statement, dated February 1, 2002 (reproduced in Conrad Aff. Ex. 18), at 1. Gulf's liability for this "make-whole payment" is the subject of the current lawsuit.

### B. *The Communications*

Bombardier Capital has submitted an index of the documents that it asserts are privileged. *See* Bombardier Capital Inc.'s

Joint Defense Privileged Documents Index (undated). It has also submitted the documents themselves to the Court, which the Court has reviewed *in camera.* The documents, primarily in the form of e-mails, consist of communications between employees of Bombardier Aerospace and Bombardier Capital. On the Bombardier Aerospace side, the communications are to or from Dylan Haynie, an in-house attorney, and/or Cheryl Hayes, a legal assistant. On the Bombardier Capital side, the employees sending or receiving the communications were Julia Males, an in-house attorney; Patrick Mathieson, the Director of Asset Management and Collections; Carolyn Gipson, a Collections Manager; and/or Lynn Parah, a Collections Coordinator.

The documents are divisible into two broad categories. First, there are a number of documents generated after the January 2001 lawsuits were filed, almost all of which relate to the amount owed by Gulf to Bombardier Capital under the Capital Agreements. Exhibits 9–13, 25, 28. The bulk of these documents were generated in late July and early August 2002. Second, there are a series of e-mails sent between employees of Bombardier Aerospace and Bombardier Capital from January 29 through February 1, 2002—after the Settlement Agreement had been signed. These communications also involve discussions of the amount of money owed under the Capital Agreements as well as what documentation would be required to consummate the Settlement Agreement. Exhibits 3–8, 14–23, 26–27.[1]

Bombardier Capital seeks to avoid production of these documents and to prevent Gulf from obtaining deposition testimony of the persons involved in the communications. As noted, Bombardier seeks to protect these documents and communications under two theories: the attorney-client/joint-defense privilege and work product protection. Each is discussed separately.

---

**1.** During the course of briefing on the instant motion, Gulf announced that it does not seek production of the remaining documents, Exhibits 1, 2, and 24, which were created after Gulf had filed this lawsuit. *See* Gulf Island Leasing, Inc.'s

Memorandum of Law in Opposition to Bombardier Capital, Inc.'s Assertion of the Work Product Privilege, dated February 21, 2003 (Docket # 38) ("Gulf Work Product Opp."), at 5 n. 4.

## II. ATTORNEY–CLIENT/JOINT DEFENSE PRIVILEGE

### A. Choice of Law

■ This Court's subject matter jurisdiction is based upon diversity. Accordingly, State law provides the rule of decision concerning the claim of attorney-client privilege. *See* Fed.R.Evid. 501; *Dixon v. 80 Pine Street Corp.*, 516 F.2d 1278, 1280 (2d Cir.1975); *ECDC Envt'l. v. New York Marine and Gen. Ins. Co.*, 1998 WL 614478, at *3 (S.D.N.Y. June 4, 1998). In this case, the potentially relevant contracts contain choice of law provisions for two different states. The Capital Agreements—under which the disputed "make-whole payment" arose—specify that New York law governs their construction. *See* Loan Agreement § 7.7; Security Agreement § 12(f). The Settlement Agreement—which ostensibly settled the dispute between Bombardier Aerospace and Gulf—specifies that Texas law governs. *See* Settlement Agreement § 9.1. The parties' briefing does not address the choice-of-law issue and instead simply cites cases applying the attorney-client privilege under New York and federal law. As such, the parties have implicitly consented to having New York privilege law apply and this "implied consent ... is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000) (citing *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)).[2]

### B. Law Governing Joint Defense/Common Interest Privilege

■ Bombardier Capital has asserted that the documents and subjects it seeks to protect are covered by a "joint defense" privilege or "common interest" rule. Bombardier Capital makes this argument without any reference to the applicability of the attorney-client privilege itself. The common interest rule, however, is not a separate privilege but " 'an extension of the attorney client privilege.' " *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (quoting *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 n. 7 (9th Cir.1987)), *cert. denied*, 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991). It protects "the confidentiality of communications from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties." *Id.; accord Bank of America, N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F.Supp.2d 493, 496 (S.D.N.Y.2002); *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 520 (S.D.N.Y.2001); *Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879, 893 (S.D.N.Y. 1999). Thus, before a communication can be protected under the common interest rule, the communication must meet the other applicable elements of the attorney-client privilege.

■ "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (citation omitted). Under New York law, in order for the attorney-client privilege to apply, there must be a communication made " 'for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship.' " *Spectrum Sys. Int'l Corp. v. Chemical Bank*, 78 N.Y.2d 371, 377–78, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (1991) (quoting *Rossi v. Blue Cross & Blue Shield*, 73 N.Y.2d 588, 593, 542 N.Y.S.2d 508, 540 N.E.2d 703 (1989)). In addition, "[t]he communication itself must be primarily or predominantly of a legal character." *Id.* at 378, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (citation omitted). The "critical inquiry" requires the Court to determine whether, viewing its contents in full, the communication was made to facilitate rendition of legal advice or ser-

---

**2.** Following the initial briefing, the Court asked the parties to affirmatively state their views as to what state law should apply regarding the attorney-client privilege. Bombardier Capital thereafter sent a letter stating that Vermont law, which it contended follows Second Circuit precedent, should apply because the communications at issue originated in that state. *See* Letter from Patrick Salisbury, dated January 30, 2003, at 1–2. Gulf indicated that this Court should apply the "law of the Second Circuit." Letter from Robert Lovett, dated January 31, 2003, at 1–2. As discussed further below, the issue is of no consequence because federal law, as interpreted by the Second Circuit, is essentially in accord with New York law on the pertinent issues.

vices to a client. *Id.* at 379, 575 N.Y.S.2d 809, 581 N.E.2d 1055.

New York courts applying the common interest rule to civil proceedings have often looked to federal case law for guidance. *See, e.g., Stenovich v. Wachtell, Lipton, Rosen & Katz,* 199 Misc.2d 99, 756 N.Y.S.2d 367, 376–78 (Sup.Ct.N.Y.Co.2003); *Brooklyn Navy Yard Cogeneration Partners, L.P. v. PMNC,* 194 Misc.2d 331, 753 N.Y.S.2d 343, 345–46 (Sup.Ct. Kings Co.2002). With few exceptions, New York law involving the attorney-client privilege and the common interest rule follows federal privilege law. *See Bowne v. AmBase Corp.,* 150 F.R.D. 465, 470 (S.D.N.Y. 1993). Therefore the Court will examine both federal and New York cases to determine if Bombardier Capital has proven the applicability of the rule.

 The common interest rule is intended to allow clients to share information with an attorney for another party who shares the same legal interest. *See SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Properties, LLC,* 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002) (*"SR Int'l I"*). Like all privileges, the common interest rule is narrowly construed. *See, e.g., United States v. Weissman,* 195 F.3d 96, 100 (2d Cir.1999) ("[p]rivileges should be narrowly construed and expansions cautiously extended.") (citing *Univ. of Pennsylvania v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990)); *see also Aetna Cas. and Sur. Co. v. Certain Underwriters at Lloyd's London,* 176 Misc.2d 605, 612, 676 N.Y.S.2d 727 (Sup. Ct.N.Y.Co.1998) (the common interest rule "is subject to severe limitations and a 'narrow construction.'"), *aff'd,* 263 A.D.2d 367, 692 N.Y.S.2d 384 (1st Dep't 1999), *leave to appeal dismissed,* 94 N.Y.2d 875, 705 N.Y.S.2d 6, 726 N.E.2d 483 (2000). There are two elements of the common interest rule: (1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought were designed to further that interest. *See Johnson Matthey, Inc. v. Research Corp.,* 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002). "The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." *North River Ins. Co. v. Columbia Cas. Co.,* 1995 WL 5792, at *3 (S.D.N.Y. Jan.5, 1995) (quotation marks and citation omitted); *accord Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 447 (S.D.N.Y.1995).

With regard to the "interest" that must be shown, federal case law has repeatedly held that communications regarding business matters—even where litigation is pending or imminent—do not qualify for protection from discovery under the common interest rule. *See, e.g., In re FTC,* 2001 WL 396522, at *5 (S.D.N.Y. Apr. 19, 2001) ("courts have recognized that a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule"); *Walsh v. Northrop Grumman Corp.,* 165 F.R.D. 16, 18 (E.D.N.Y.1996) ("[t]he doctrine does not extend to communications about a joint business strategy that happens to include a concern about litigation") (citation omitted); *Bank Brussels,* 160 F.R.D. at 447. New York case law is no broader on this point, restricting the doctrine to "communication between counsel and parties with respect to legal advice in pending or reasonably anticipated litigation." *Aetna,* 176 Misc.2d at 612, 676 N.Y.S.2d 727; *see also Parisi v. Leppard,* 172 Misc.2d 951, 956, 660 N.Y.S.2d 307 (Sup.Ct.N.Y.Co.1997) ("[a] proper assertion of the privilege in a given instance therefore will rest on whether the exchange was for the purpose of giving and receiving shared legal counsel in or in anticipation of litigation, as opposed to transmitting information that was business-oriented ... in nature") (citing *Rossi,* 73 N.Y.2d at 593, 542 N.Y.S.2d 508, 540 N.E.2d 703).

Under New York law, "the burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its application must be consistent with the purposes underlying the immunity." *Spectrum Sys.,* 78 N.Y.2d at 377, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (citing cases). The same is true under federal law. *Schwimmer,* 892 F.2d at 244 (citing cases).

### C. Discussion

#### 1. Rendition of Legal Advice or Counsel

■ As discussed above, the common interest rule is an extension of the attorney-client privilege to protect communications that otherwise would be lacking in any such privilege. See Schwimmer, 892 F.2d at 243. Thus, the communications at issue must be "for the purpose of giving and receiving shared legal counsel," Parisi, 172 Misc.2d at 956, 660 N.Y.S.2d 307, and it is the burden of the party asserting a privilege to establish its existence. See Spectrum Sys., 78 N.Y.2d at 377, 575 N.Y.S.2d 809, 581 N.E.2d 1055. Such a showing must be based on competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence. See von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 147 (2d Cir.), cert. denied, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); Bowne, 150 F.R.D. at 472. The burden cannot be met by " 'mere conclusory or ipse dixit assertions' " in unsworn motion papers authored by attorneys. von Bulow, 811 F.2d at 146 (quoting In re Bonanno, 344 F.2d 830, 833 (2d Cir.1965)); see also Watson v. Mix, 38 A.D.2d 779, 328 N.Y.S.2d 161 (4th Dep't 1972) ("Defendants . . . have not shown what is in [the file] or that anything in it is privileged. The mere conclusory unverified statement that it is confidential establishes nothing.").

The only evidence that ostensibly supports Bombardier Capital's position that the communications were for the purpose of seeking legal advice comes from Haynie, who testified conclusorily that the communications at issue involved "legal advice." See Deposition of Dylan Haynie, dated November 13, 2002 (reproduced in Conrad Aff. Ex. 12) ("Haynie Dep."), at 61, 68. Yet, Haynie also acknowledged that he was representing Bombardier Aerospace's interests, that he did not discuss "the legal strategy concerns of [Bombardier Capital]" and that Bombardier Capital was "essentially a third party." Id. at 68, 328 N.Y.S.2d 161. Haynie's recounting of the communications between him and Parah revealed that the communications involved the amount of money owed under the Capital Agreements, see id. at 65–67, 328 N.Y.S.2d 161, not any legal strategies. The Court's in camera review of the documents confirms this testimony. No apparent legal strategies were discussed.

Moreover, the circumstances of the communications do not suggest that Bombardier Capital would be receiving legal advice from Bombardier Aerospace's attorney. Bombardier Capital was not a party to the lawsuits and continued receiving payments due to it under the Loan Agreement. Each corporation had its own attorney. While Bombardier Capital certainly had an interest in the dispute between Gulf and Bombardier Capital being resolved and no default occurring, this does not suggest any need for the receipt of legal advice from Bombardier Aerospace's attorneys.

■ In any event, the burden of showing that Bombardier Aerospace was providing Bombardier Capital with legal advice rests with Bombardier Capital. It has failed to meet this burden and an in camera review of the documents does not provide any additional support for such a claim. Because Bombardier Capital has failed to carry its burden of demonstrating that the communications at issue are "predominately of a legal character" or indeed at all legal in nature, the attorney-client privilege does not apply and there is no need to reach the issue of whether Bombardier Capital may invoke the common interest doctrine.

#### 2. The Nature of the Communications Involved

Even if Bombardier Capital had met its burden of showing that the communications were for the purpose of rendering legal advice, its claim of privilege would still fail because it has not proven that Bombardier Capital and Bombardier Aerospace had identical legal interests.

Bombardier Capital claims that its common legal interest with Bombardier Aerospace was the interest both companies had in Gulf not breaching any of the various agreements. See Def. Mem. at 2. But Bombardier Capital's ultimate interest in the dispute was merely a desire to ensure that the sums owed by Gulf to Bombardier Capital under its own agreements were paid. A concern to

ensure the payment of money is commercial in nature and does not qualify for protection under the common interest rule. *See, e.g., Johnson Matthey,* 2002 WL 1728566, at *6 ("[t]he shared desire to maximize royalty income is ... simply a commercial concern"). Accordingly, these interests were commercial and do not qualify for protection under the common interest rule.

Moreover, to the extent that the asserted interest could be construed to encompass a desire for Bombardier Aerospace to reach a favorable outcome in the litigation with Gulf, it is also insufficient to invoke the common interest rule. A concern shared by parties regarding litigation does not establish by itself that the parties held a common legal interest. *See, e.g., SR Int'l I,* 2002 WL 1334821, at *3 ("[s]haring a desire to succeed in an action does not create a 'common interest' ") (citations omitted); *In re FTC,* 2001 WL 396522, at *5 ("a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule"); *Shamis,* 34 F.Supp.2d at 893 ("[a]lthough [the parties] would both benefit from a judgment in favor of the plaintiff, they do not share identical legal interests. Indeed, sharing a desire to succeed in an action does not create a 'common interest' ") (citing *Int'l Ins. Co. v. Newmont Mining Corp.,* 800 F.Supp. 1195, 1196 (S.D.N.Y. 1992)).

Bombardier Capital also argues that the documents should be protected because both Bombardier Capital and Bombardier Aerospace had "coordinate[d] their legal strategy" against Gulf. Def. Mem. at 5. This argument suffers from two defects. First, the citation for the proposition that there existed such a "coordinated" legal strategy is the deposition testimony of Bombardier Aerospace's attorney, Haynie, who gave no testimony that there was such a "coordinated" strategy. Instead he testified only that he *discussed* legal strategy and that he was representing only Bombardier Aerospace's interests. Haynie Dep. at 68. Moreover, the existence even of such a coordinated legal strategy is insufficient where there is only a common commercial interest and no identity of legal interests. *See, e.g., Aetna,* 176 Misc.2d at 612–13, 676

N.Y.S.2d 727 (rejecting the use of a "coordinated legal strategy" as a basis for invoking the common interest doctrine).

Bombardier Capital's position also suffers from the defect that—even if there were some common interests—these interests were not "identical." For instance, Mathieson specifically stated that Bombardier Aerospace and Bombardier Capital had "different interests." Continued Deposition of Patrick J. Mathieson, dated October 29, 2002 (reproduced in Salisbury Decl. Ex. L), at 14. Males, who was Bombardier Capital's attorney, testified as follows:

Q Let me ask a different [question]. [Bombardier Capital's] interests respecting Gulf were to be paid, correct?

A [Bombardier Capital's] interests, yes, sure.

Q And those interests were business interests, right?

A Yes.

Q And those interests were separate interests from Bombardier Aerospace, correct?

A Yes.

Deposition of Julia Males, dated October 30, 2002 (reproduced in Salisbury Decl. Ex. N), at 43. Thus Males acknowledged that Bombardier Capital and Bombardier Aerospace held different interests—in addition to admitting that Bombardier Capital's interests were business in nature.

Bombardier Capital's argument that the two companies had the same interests relies heavily on the fact that the two companies are subsidiaries of a common owner. *See generally* Bombardier Capital Inc.'s Reply to Gulf Islands Leasing Inc.'s Opposition to Assertion of the Joint Defense Privilege, dated December 18, 2002, at 3. While cases have upheld assertions of the common interest rule for related companies, "they have done so only upon a showing that a common attorney was representing both corporate entities or that the two corporations shared a common legal interest." *Bowne,* 150 F.R.D. at 491 (citing cases). Thus, the proponent of the privilege must still prove a common legal interest and may not rely solely on the fact that the entities at issue are affiliated with

each other. *See Roberts v. Carrier Corp.*, 107 F.R.D. 678, 687–88 (N.D.Ind.1985); *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 616 (D.D.C.1979).

Some cases state the broad proposition that disclosure of attorney-client privileged information to an affiliated company does not waive the privilege—thereby obviating the need to invoke the common interest rule. *See, e.g., Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2000 WL 1800750, at *6 (S.D.N.Y. Dec. 7, 2000); *Music Sales Corp. v. Morris*, 1999 WL 974025, at *7 (S.D.N.Y. Oct. 26, 1999); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1185 (D.S.C.1974), *aff'd*, 540 F.2d 1215 (4th Cir. 1976). But it appears that in such cases no waiver was found because the entities were represented by a common attorney, *see Cary Oil*, 2000 WL 1800750, at *3–6, or shared a common legal interest. *See Music Sales*, 1999 WL 974025, at *3; *Duplan*, 397 F.Supp. at 1184. In this case, however, Bombardier Capital and Bombardier Aerospace utilized different attorneys and held different interests of a commercial, not legal, nature.

■ The mere existence of an affiliate relationship does not excuse a party from demonstrating the applicability of the common interest rule. Having chosen to operate as separate entities—and to obtain whatever advantages inure from so operating—Bombardier Capital and Bombardier Aerospace must be held to their burden of proving the applicability of any privilege in the same manner as two unrelated entities. That burden has not been met in this case.

## III. *THE WORK PRODUCT DOCTRINE*

### A. *Applicable Law*

Bombardier Capital also seeks to protect the documents from disclosure under the work product doctrine on the ground that they were "prepared in anticipation of litigation or for trial." Fed.R.Civ.P. 26(b)(3). The work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye towards litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir.1998) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). The party asserting work product protection "bears the burden of establishing its applicability to the case at hand." *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 384 (2d Cir.2003) (citing cases). This includes establishing that all required elements exist and that the protection has not been waived. *See RLS Assocs., LLC v. United Bank of Kuwait, PLC*, 2003 WL 1563330, at *3 (S.D.N.Y. Mar. 26, 2003); *Resolution Trust Corp. v. Mass. Mut. Life Ins. Co.*, 200 F.R.D. 183, 188 (W.D.N.Y.2001) (citation omitted); *Granite Partners v. Bear, Stearns & Co. Inc.*, 184 F.R.D. 49, 52 (S.D.N.Y.1999) (citing cases).

" '[T]hree conditions must be met to earn work product protection. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative.' " *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2002 WL 31556382, at *4 (S.D.N.Y. Nov. 15, 2002) (quoting *In re Grand Jury Subpoenas Dated December 18, 1981 & January 4, 1982*, 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)) (citations omitted); *accord SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Properties LLC*, 2002 WL 1455346, at *2 (S.D.N.Y. July 3, 2002) (citation omitted). The dispute in this case focuses on the second element: whether the documents at issue were prepared in anticipation of litigation.

In *Adlman*, the Second Circuit held that material will meet the "in anticipation of litigation" requirement if " 'in light of the nature of the document and the factual situation of the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.' " 134 F.3d at 1202 (emphasis in original) (quoting 8 Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, *Federal Practice and Procedure* § 2024, at 343 (1994)) (citing cases). Work product protection, however, is not afforded to

documents that are prepared in the ordinary course of business or that would have been created in essentially similar form

irrespective of the litigation. It is well established that work-product privilege does not apply to such documents. *See* Fed.R.Civ.P. 26(b)(3), Advisory Committee's note ("Materials assembled in the ordinary course of business ... are not under the qualified immunity provided by this subdivision.") ... Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created "because of" actual or impending litigation.

*Id.* (citations omitted); *see also In re Grand Jury Proceedings,* 2001 WL 1167497, at *14 (S.D.N.Y. Oct. 3, 2001) ("It is not enough that a document is created after the threat of litigation becomes real, but it is also necessary that the motivation for creating that document be the litigation."). Accordingly, while a document does not lose work product protection "merely because it is created in order to assist with a business decision," *Adlman,* 134 F.3d at 1202, it "will not be protected if it is created in the ordinary course of business." *In re Grand Jury,* 2001 WL 1167497, at *14 (citing cases).

### B. *Bombardier Capital's Assertion of Work Product Protection*

As noted, the documents at issue all concern the same subject: the amount owed Bombardier Capital under the Capital Agreements and the steps necessary to ensure that Bombardier Capital was paid the proper amount upon the consummation of the Settlement Agreement. The amount to be paid to Bombardier Capital was certainly critical to Bombardier Aerospace's resolution of the lawsuit against it because Bombardier Aerospace needed to know how much money Gulf would have to pay to Bombardier Capital in the event of a settlement. Thus, the documents reflect Bombardier Aerospace's efforts to obtain from Bombardier Capital the "payoff amount" for this loan. Bombardier Capital's argument that the communications are attorney work product rests on its assertion that the communications occurred "only because of the threatened or anticipated litigation between Gulf and [Bombardier Capital]." Memorandum of Law of Bombardier Capital Inc. in Support of its Assertion of the Work Product Protection, dated February 11, 2003 (Docket # 36) ("Def. Work Product Mem."), at 7–8.

Whether material was prepared "in anticipation of litigation" requires a determination of the subjective question of whether the party actually thought it was threatened with litigation and the objective question of whether that belief was reasonable. *See, e.g., Rexford v. Olczak,* 176 F.R.D. 90, 91 (W.D.N.Y.1997) (citing *Chiquita Int'l Ltd. v. M/V Bolero Reefer,* 1994 WL 263603, at *2 (S.D.N.Y. June 7, 1994)). In order to demonstrate such a subjective belief, a party asserting work product protection will generally submit affidavits or similar evidence establishing that it held such a belief. *See, e.g., Prebena Wire Bending Machinery Co. v. Transit Worldwide Corp.,* 1999 WL 1063216, at *4 (S.D.N.Y. Nov. 23, 1999); *Atlantic Richfield Co. v. Current Controls, Inc.,* 1997 WL 538876, at *2 (W.D.N.Y. Aug. 21, 1997). Other than the unsupported statements in its memoranda of law, however, Bombardier Capital submitted no evidence in its initial motion papers that would establish that Bombardier Capital subjectively believed at the time that litigation was imminent.

Gulf, which does not bear any burden, responded by submitting deposition testimony to support its position that communications regarding payoff amounts were routine and thus not created in anticipation of litigation. For example, Bombardier Capital's employees who oversee finance loans are called upon to provide approximately 25 payoff amounts per month. *See* Deposition of Carolyn R. Gipson, dated October 29, 2002 ("Gipson Dep.") (reproduced in Affidavit of William B. Fleming in Support of Gulf Island Leasing, Inc.'s Memorandum of Law in Opposition to Bombardier Capital, Inc.'s Assertion of the Work Product Privilege, filed February 21, 2003 (Docket # 40) ("Fleming Aff."), Ex. 15), at 15. These amounts are generated by a computer program, *id.* at 11, and require examining documentation available to both sides—the Loan Agreement—to determine the amounts due. *Id.* at 31–33. The generation of such amounts was part of Bombardier Capital's regular business. Thus, communications generated for pur-

poses of this function would have taken place "in essentially similar form irrespective of the litigation." *Adlman*, 134 F.3d at 1202. Notably, the agreement with Bombardier Capital itself contemplated the potential for prepayment of the loan in certain situations. *See* Loan Agreement, § 2.4. That the calculation of the payoff amount included a calculation of the "make whole" or "breakage" amounts does not convert these calculations into those undertaken in anticipation of litigation. Such calculations were regularly performed as part of computing the payoff amounts. *See* Gipson Dep. at 12–13; Deposition of Patrick J. Mathieson, dated September 12, 2002 (reproduced in Fleming Aff. Ex. 18), at 66.

Bombardier Capital makes much of the fact that there was ongoing litigation between Bombardier Aerospace and Gulf during much of the period at issue. *See* Reply Memorandum of Law of Bombardier Capital, Inc. in Support of its Assertion of the Work Product Protection, dated February 28, 2003 (Docket # 41) ("Def. Work Product Reply"), at 7–8. But this argument shows only that the documents were created because of the litigation against *Bombardier Aerospace*. Litigation against a separate entity, however, is insufficient to show that the documents were created "because of" Bombardier Capital's own anticipation of litigation. *Adlman*, 134 F.3d at 1202. For its own part, Bombardier Capital was receiving the payments due to it under the Loan Agreement. Once the Settlement Agreement was entered into, it had every reason to expect that it would be paid as part of the consummation of that agreement.

▬▬ Certainly, Bombardier Capital might have foreseen that there might someday be a dispute with Gulf about its calculations or the imposition of the "make whole" or "breakage" payments. But a mere potential for a future dispute is insufficient to show that a party acted in "anticipation of litigation." Instead a "substantial probability" of litigation must exist and the concern that litigation may occur must be real, not speculative. *In re Grand Jury*, 2001 WL 1167497, at *14. No such showing has been made here.

Notably, the first time that Gulf wrote Bombardier Capital, as opposed to Bombardier Aerospace, about the disputed "make-whole payment" was after the date the payment was made and after the documents at issue were created. *See* Letter from Craig S. Sternberg to Patrick Mathieson, dated February 12, 2002 (reproduced in Fleming Aff. Ex. 16), at 1–3. Moreover, Males testified that she was unaware of any legal dispute between Gulf and Bombardier Capital until after the settlement between Gulf and Bombardier Aerospace was completed. *See* Deposition of Julia Males, dated October 30, 2002 (reproduced in Fleming Aff. Ex. 13), at 17.

By way of reply brief, Bombardier Capital claims that the threat of litigation existed because of statements made by Gulf to employees of Bombardier Aerospace or Bombardier Inc., questioning their obligation to pay Bombardier Capital under the Loan Agreement, contesting the "make whole" payment and preserving Gulf's rights against Bombardier Capital in settling with Bombardier Aerospace. *See* Def. Work Product Reply at 5–6. The Court could properly ignore these arguments because they were first made by way of reply memorandum. *See, e.g., Romeu v. Cohen*, 121 F.Supp.2d 264, 273 (S.D.N.Y.2000), *aff'd*, 265 F.3d 118 (2d Cir. 2001). In any event, the mere fact that a potential dispute looms on the horizon is insufficient to show that the communications regarding the payoff amount, including the make-whole payment, would not have been made in precisely the same form as part of the regular course of Bombardier Capital's business irrespective of the possibility of litigation. *See Adlman*, 134 F.3d at 1202. The documents at issue consist only of discussions that were directly relevant to provide the payoff amount needed to consummate the Settlement Agreement. *See RLS Associates*, 2003 WL 1563330, at *5 ("Although [defendant] may have been concerned that, should it opt to follow a certain course, litigation might follow, it appears that the document . . . would have been created irrespective of the anticipated litigation. For this reason, the document may not be protected as work product.") (citing *Adlman*, 134 F.3d at 1203–05).

### Conclusion

For the reasons stated above, the motion for a protective order is denied.[3]

---

**3.** While not listed on the privilege log of the documents ostensibly at issue in this· motion, Bombardier Capital asserted in the middle of the briefing on this motion that one document, stamped 1035, is protected by the attorney-client privilege and the work product doctrine. *See* Def. Work Product Mem. at 9. This document, which has been reviewed *in camera*, consists of two e-mails sent between Bombardier Capital employees discussing how much Bombardier Capital was entitled to receive under the Loan Agreement. One e-mail was sent to Michel Bourgeois, a Bombardier Capital Vice–President and General Manager who apparently is also an attorney, although not admitted to practice in the United States. *See* Gulf Work Product Opp. at 12, 13 n. 5.

The document is not protected by the attorney-client privilege because Bombardier Capital has failed to show either that the e-mails were com-munications made to or from an individual acting in his capacity as an attorney or that they were made for the purpose of obtaining or providing legal advice. Bombardier Capital's mere assertion in its brief that the e-mails were created "as a part of [Bombardier Capital's] legal review ... of the provisions in the [Capital Agreements] ...," Def. Work Product Mem. at 10, is insufficient to meet its burden. *von Bulow*, 811 F.2d at 146 ("mere conclusory or ipse dixit assertions" insufficient to show privilege) (citation omitted).

Bombardier Capital also asserts this document is entitled to work product protection. This document was created at the same time as the other documents discussed herein, however, and addresses the same topic: the payoff amount resulting from Gulf's prepayment. For the same reasons as stated above, it does not qualify for work product protection.