COMPLEX SYSTEMS, INC., Plaintiff,

v.

ABN AMRO BANK N.V., Defendant.

No. 08 Civ. 7497(LBS)(FM).

United States District Court,
S.D. New York.

Oct. 26, 2011.

## MEMORANDUM DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

In this action, plaintiff Complex Systems, Inc. ("CSI"), contends that defendant ABN AMRO Bank N.V. ("ABN") made improper use of CSI's copyrighted "BankTrade" software after ABN assigned its license to use that software to the Bank of America Corporation ("BAC") as part of its sale of several of its subsidiaries to BAC. When CSI sought the payment of additional fees for this allegedly wrongful use, ABN's parent corporation, Royal Bank of Scotland ("RBS"), at first maintained through its in-house counsel that ABN had made no use of the software after the sale and that BAC was the licensee pursuant to an assignment. Soon thereafter, however, RBS switched course, claiming that the BankTrade software license rights had been assigned to ABN as part of the sale transaction.

By agreement, ABN has clawed back certain documents concerning this dramatic about-face which it previously had produced to CSI. In letter-briefs to the Court, ABN contends that these documents constitute attorney-client communications and work product. CSI disagrees, arguing that the documents are not privileged and, even if privileged, must be produced because ABN has placed their contents "at issue" and because they fall within the crime-fraud exception. CSI further requests that the Court review the contested documents *in camera.* Finally, CSI asks that ABN be directed to produce its deposition witnesses anew so that they can be asked questions that they declined to answer on privilege grounds.

For the reasons set forth below, with minor exceptions, CSI's application is conditionally denied.[1]

1. In an effort to reduce cost, the parties submitted their dispute through letter briefing, rather than formal motion papers. Unfortunately, the original two submissions that I authorized, (*see* ECF No. 87), grew to be a series of ten letters. So that the public record will be complete, counsel will be required to file electronically copies of their letters dated April 28, June 6, June 10, June 17, June 20, June 21, August 29, September 8, and September 15, 2011. The tenth letter, dated

## I. *Factual and Procedural Background*

In April 2007, ABN agreed to sell BAC its retail banking business ("LaSalle Bank"), together with several related subsidiaries, for $21 billion. (Letter from Jeffrey I. Kaplan, Esq., to the Court, dated Apr. 28, 2011 ("April 28 Letter"), at 3). One such subsidiary was ABN AMRO Information Technology Services Company, Inc. ("IT"). (*Id.*). The transaction, which took effect on October 1, 2007 ("October Transaction"), was memorialized in a series of documents, including a Purchase and Sale Agreement ("PSA") and a Transition Services Agreement ("TSA"). (*Id.* at 3–5; Decl. of Jeffrey I. Kaplan, Esq., dated Apr. 28, 2011 ("Kaplan Decl."), Ex. A). Subsequently, ABN itself was acquired after a consortium of banks led by RBS made a hostile competing bid for the company. (Letter from John C. Garces, Esq., to the Court, dated June 6, 2011 ("June 6 Letter"), at 4 n. 5). As part of the latter transaction, RBS retained ABN's wholesale banking business. (*Id.* at 4).

The license agreement that gives rise to this lawsuit is dated October ___, 1997[2] but was signed on November 1, 1997. (April 28 Letter at 3; Kaplan Decl. Ex. E at 3). Pursuant to the license (as later amended) ("License") CSI granted IT and certain other ABN entities the right to use CSI's BankTrade software system. (*See* Kaplan Decl. Exs. A, B). The BankTrade software is used by banks to process international financial transactions, such as letters of credit and foreign exchange funds transfers. (ECF No. 1 ¶ 8).

On January 28, 2008, CSI sent BAC a "cease-and-desist" letter, in which it alleged that ABN was permitted to assign the License "only to a direct or indirect parent,

September 16, 2011, is already publicly filed since I "memo endorsed" it to indicate that I did not wish to receive any further correspondence from either side until I had ruled. (*See* ECF No. 98).

2. The actual date of execution is not filled in on the copy of the License furnished to the Court. (Kaplan Decl. Ex. A).

subsidiary or affiliate of [the] Licensee." (June 6 Letter at 5, Ex. 1). CSI noted that the term "Licensee" was defined to include "any entity which is at least 80% owned by [ABN] or [its subsidiary North American holding company]." (*Id.*). CSI alleged that because BAC had acquired the ABN North American holding company, it was "evident that BAC's own services subsidiary was "using the BankTrade system without a license." (*Id.*). CSI therefore demanded that BAC cease and desist from any further use of BankTrade until a new license could be negotiated. (*Id.*).

On February 27, 2008, CSI sent Sir Fred Goodwin, RBS's Group Chief Executive, a similar letter, which alleged that ABN no longer held the License by virtue of its sale of IT and the North American holding company to BAC. (*Id.* at 5, Ex. 2). CSI further alleged that ABN nevertheless was continuing to process trades using BankTrade. (*Id.*). CSI therefore demanded both damages for past unauthorized use and that RBS cease and desist "unless and until" a new license agreement was negotiated. (*Id.*). The CSI letter concluded with the threat that, "unless we hear from you or your designated representative within ten (10) business days . . ., we will have no alternative but to seek relief through the formal legal process." (*Id.*).

Both BAC and RBS responded to CSI's letters. In an email dated February 29, 2008, Tom Trujillo, a BAC Assistant General Counsel, represented that the License had remained with the "contracting LaSalle [Bank] entity," *i.e.*, IT, which was using the BankTrade software "completely within the permissible scope" of the License. (April 28 Letter at 4; Kaplan Decl. Ex. E at 1). Trujillo also chastised CSI for reaching out to ABN since "ABN is not a party to the subject contract." (Kaplan Decl. Ex. E at 1).

RBS responded by means of a letter dated March 3, 2008, from Sheldon Goldfarb, General Counsel of "RBS America," who had recently been appointed to that position. (June 6 Letter at 6; Kaplan Decl. Ex. E at 3). The language of the Goldfarb letter was drafted primarily by Holly Lussier, an attorney in an RBS subsidiary, who had reviewed the PSA, but not the TSA. (June 6 Letter at 6, Ex. 7 ("Lussier Dep.") at 83, Ex. 8 ("Goldfarb Dep.") at 14). In the letter, Goldfarb stated that ABN was not a party to the License following the October Transaction, and that any questions concerning use of the BankTrade software should be directed to BAC. (Kaplan Decl. Ex. E at 3).

Lussier later modified RBS's position regarding the BankTrade software in an email that she sent to Warren Browne of CSI in April 2008. (*Id.* Ex. E at 4). In that email, Lussier reiterated that BAC, "as successor in interest to [IT]," was the current licensee of the software, but she sought to assign the License back to ABN because it allegedly "was never the business intent that [the License] would be transferred to BAC." (*Id.*).

Having initially maintained that BAC was the licensee, Lussier and RBS then retreated from that position over the following months. (*See* June 6 Letter at 6–7). In the interim, Lussier apparently had reviewed the TSA. (*See* Lussier Dep. at 83). In a letter dated June 26, 2008 (on which she was copied), Michael Lofgren, RBS's Chief Executive Procurement Officer, advised Gad Janay, CSI's Chief Executive Officer, that RBS now believed that the License had been "properly assigned" from IT to ABN, a position that RBS also espoused during a meeting with CSI representatives a month earlier. (June 6 Letter Ex. 9).

Consistent with its revised view, ABN now maintains in this lawsuit that the License assignment in fact took place as part of the October Transaction because the TSA lists ABN in an Annex as both the BankTrade "Application Owner" and the "Application Client[ ]." (*See* June 6 Letter at 4; Kaplan Decl. Ex. F at Annex 1(a)(vii)). ABN also appears to suggest that ABN, IT, and BAC never used the BankTrade software improperly, noting that BAC had its own software to process the type of trades that the BankTrade software addressed. (June 6 Letter at 7–8). Although BAC needed to track certain trades using the BankTrade software until the transfer of LaSalle Bank's operations to BAC was complete, ABN maintains that, even before IT was sold, IT's computer trading applications had been outsourced to third

parties. (*Id.* at 8). Among those third parties were IBM, which maintained the ABN hardware, and Infosys, which serviced its software applications. ABN contends that both before and after the October Transaction, the BankTrade application was being used (and perhaps modified) by employees of these outside companies, rather than ABN or BAC employees. ABN further contends that this was being done within the scope of the License. (*Id.*).

CSI questions the veracity of ABN's representations, pointing to ABN's change of position as the basis for its concern. (*See, e.g.,* April 28 Letter at 6). CSI also asks that the Court review in *camera* 54 of the documents that ABN has clawed back. (Letter from Mr. Kaplan to the Court, dated Aug. 29, 2011 ("August 29 Letter"), at 1). At my request, ABN produced those 54 documents to me on August 25, 2011.[3] (ECF No. 96).

Once the present dispute is resolved, the parties should be able to complete any outstanding discovery and submit renewed cross-motions for summary judgment. Their original cross-motions became moot after the Court granted CSI substantial additional discovery. Accordingly, those motions were withdrawn on February 22, 2011. (ECF No. 87).

## II. *Discussion*

Although CSI's opening fusillade in the letter briefs submitted to the Court focused exclusively on the attorney-client privilege, (*see* April 28 Letter), ABN actually places principal reliance on the work product rule as its basis for withholding the documents that CSI seeks, (*see* June 6 Letter at 8–10). Accordingly, I will turn first to ABN's claims of work product protection.

### A. *Work Product*

#### 1. *Applicable Law*

 Originally promulgated in *Hickman v. Taylor,* 329 U.S. 495, 514, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and subsequently codified in Fed.R.Civ.P. 26(b)(3), the work product rule "shields from disclosure materials 'prepared in anticipation of litigation' by a party or the party's representative, absent a showing of substantial need." *United States v. Adlman* ("*Adlman I*"), 68 F.3d 1495, 1501 (2d Cir.1995) (quoting Fed.R.Civ.P. 26(b)(3)). The purpose of the rule is to afford a litigant "a zone of privacy in which [his] lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman* ("*Adlman II*"), 134 F.3d 1194, 1196 (2d Cir.1998) (quoting *Hickman,* 329 U.S. at 511, 67 S.Ct. 385). Although both opinion and factual work product fall within the scope of the doctrine, an attorney's mental impressions, conclusions, opinions, or legal theories concerning litigation typically are afforded greater protection. *Adlman II,* 134 F.3d at 1199, 1204. Moreover, because "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial," the work product rule extends to "material prepared by agents for the attorney as well as those prepared by the attorney for himself." *United States v. Nobles,* 422 U.S. 225, 238–39, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

 A party claiming work product protection bears the burden of showing that the material withheld constitutes "[a] a document or tangible thing, [b] that was prepared in anticipation of litigation, and [c] was prepared by or for a party, or by or for his representative." *Gucci Am., Inc. v. Guess?, Inc.,* 271 F.R.D. 58, 73–74 (S.D.N.Y.2010). The work product doctrine thus "does not shield from disclosure everything that a lawyer does." *Rattner v. Netburn,* No. 88 Civ. 2080(GLG)(MHD), 1989 WL 223059, at *6 (S.D.N.Y. June 20, 1989). The Second Circuit nevertheless "has interpreted the 'in anticipation of litigation' requirement broadly." *Strougo v. BEA Assocs.,* 199 F.R.D. 515, 520 (S.D.N.Y.2001). A document therefore "will be found to have been prepared 'in anticipation of litigation' if, 'in light of the nature of

---

**3.** In addition to asking the Court to overrule ABN's work product and attorney-client privilege claims, CSI requests that the Court spot check the documents to ensure that documents alleged to be duplicative or irrelevant in fact are. (August 29 Letter at 2). My review satisfies me that the statements in the ABN privilege log to that effect are accurate.

the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Clarke v. J.P. Morgan Chase & Co.*, No. 08 Civ. 2400(CM)(DF), 2009 WL 970940, at *7 (S.D.N.Y. Apr. 10, 2009) (quoting *Adlman II*, 134 F.3d at 1202). On the other hand, a mere "possibility" of litigation is insufficient to obtain work product protection. *Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, No. 03 Civ. 5560(RMB)(HBP), 2007 WL 473726, at *5 (S.D.N.Y. Feb. 14, 2007). To prevail, the non-producing party must show that the document was "prepared because of the prospect of litigation when the preparer face[d] an actual claim or potential claim following an actual event or series of events that reasonably could result in litigation." *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.*, 160 F.R.D. 437, 448–49 (S.D.N.Y.1995).

■■■■ "Accordingly, documents prepared in the ordinary course of business, or that otherwise would have been prepared absent the prospect of litigation, do not receive work product protection." *Gucci Am., Inc.*, 271 F.R.D. at 74. By the same token, however, a document prepared because of the prospect of litigation will not lose its protection under the work product doctrine simply because it may assist in business decisions. *Adlman II*, 134 F.3d at 1202 ("Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection under this formulation merely because it is created to assist with a business decision.").[4]

## 2. *Application of Law to Facts*

In its papers, CSI contests only one element of the showing required for work product protection, claiming that ABN cannot show that the documents in question were prepared in anticipation of litigation, rather than in the ordinary course of business. CSI further maintains that even if the documents constitute work product, ABN cannot withhold any purely factual information that they contain. (*See* letter from Mr. Kaplan to the Court, dated June 10, 2011, at 3).

Rather than merely relying on the privilege log to resolve these issues, I have chosen to review each of the 54 contested documents. With only one minor exception, those documents reflect discussions that were being undertaken because of CSI's threat to pursue "formal legal process" unless RBS complied with its demands. There consequently is no basis upon which the Court could conclude that these documents are not work product documents.

■■■■ The one outlier document, identified on ABN's privilege log as Document 14, Item 34, is an email from Ray Crescenzi, an outside consultant, to Kevin Buttler, an ABN employee responsible for the outsourcing of its data processing functions. The privilege log alleges that Crescenzi's email "asks Buttler to clarify legal advice and strategy that Buttler related to Crescenzi and seeks further legal advice." (June 6 Letter Ex. A ("ABN Privilege Log") at 8 (block capitalization omitted)). Although that may be an accurate description of the first paragraph of the email, the second paragraph deals purely with factual matter concerning the need to modify the BankTrade software. Moreover, it appears that Crescenzi would have had the same concern even if there had been no dispute between ABN/RBS and CSI. For this reason, ABN's work product claim with respect to the second paragraph of this email is overruled.

## 3. *Communications with BAC*

■■■■ Certain of the other work product documents withheld by ABN reflect communications between Lussier and BAC attor-

---

4. In its letter briefs, CSI contends that the federal courts have "created a legal presumption that ... communications [by in-house counsel] are not privileged." (April 28 Letter at 14) (citing *e.g., Leazure v. Apria Healthcare Inc.*, No. 1:09–cv–224, 2010 WL 3895727 (E.D.Tenn. Sept. 30, 2010)). In *Leazure*, Magistrate Judge William L. Carter acknowledged "the always difficult and uncomfortable question of the 'hat' in-house counsel wears." *Id.* at *4. However, neither Judge Carter nor any of the other authorities upon which CSI relies goes so far as to suggest that there is a "presumption" that any communications between in-house counsel and corporate employees are not privileged.

neys. CSI argues that these emails must be disclosed because ABN and BAC did not share a common legal interest. (April 28 Letter at 15–17) (citing *Bank Brussels Lambert,* 160 F.R.D. at 447; *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's London,* 176 Misc.2d 605, 676 N.Y.S.2d 727 (Sup. Ct. N.Y. County 1998)). Work product protection is waived by the disclosure of documents to third parties, however, only if the disclosure "substantially increases the opportunity for potential adversaries to obtain the information." *In re Pfizer Inc. Sec. Litig.,* No. 90 Civ. 1260(SS), 1993 WL 561125, at *6 (S.D.N.Y. Dec. 23, 1993) (quoting *In re Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)); *accord Trudeau v. N.Y.S. Consumer Prot. Bd.,* 237 F.R.D. 325, 338 (N.D.N.Y.2006).

■ In this case, although the interests of ABN and BAC were not precisely aligned, both companies hoped to defeat CSI's claim that a breach of the License terms had occurred. Indeed, in August 2008, ABN, RBS, BAC and IT entered into a Common Interest/Joint Defense Agreement, which recites that they had a "mutual common legal interest by virtue of their status as potential defendants because they anticipate and have a reasonable apprehension that CSI will bring suit against them." (June 6 Letter Ex. 11 at 1). While this agreement certainly is not dispositive, there is no reason to believe that the sharing of information between and among the four entities, including BAC, increased the likelihood that CSI would become privy to it. The fact that ABN and BAC (and their related companies) shared work product materials and information therefore did not effect a waiver of work product protection.

#### 4. *"At Issue" Waiver*

■ A party also may waive (or forfeit) work product protection by placing its privileged information at issue in a litigation. *See generally In re Grand Jury Proceedings,* 219 F.3d 175, 191 (2d Cir.2000). This "typically occurs when [a party] place[s] a protected document in issue through some affirmative act intended to inure to that party's benefit

or where the party makes selective use of the privileged materials." *Gruss v. Zwirn,* 276 F.R.D. 115, 133 (S.D.N.Y.2011). As the Second Circuit has cautioned, "[w]hether fairness requires disclosure … is best decided on a case by case basis, and depends primarily on the specific context in which the privilege is asserted." *In re Grand Jury Proceedings; John Doe Co. v. United States,* 350 F.3d 299, 302 (2d Cir.2003) (quoting *In re Grand Jury Proceedings,* 219 F.3d at 183).

Here, after first representing that BAC was the entity that owned and was using the BankTrade licensed software, ABN reversed course and contended that the License had been assigned to ABN pursuant to the TSA. (June 6 Letter at 6–7). ABN further represented through the testimony of its witnesses that Lussier and Goldfarb initially misunderstood the facts because they worked for RBS, which was a stranger to the October Transaction, and therefore were unaware of the details of ABN's sale of IT to BAC when they first communicated with CSI. (*See, e.g.,* Lussier Dep. at 83; Goldfarb Dep. at 16). As Lussier explained at her deposition, when CSI first raised its concerns, she focused on the fact that IT—an entity that had been sold—was the signatory on the License. (Lussier Dep. at 82–83). Lussier therefore concluded that BAC had the right to use the BankTrade software and sought to negotiate a consent fee to be paid to recapture those rights for ABN. (*See id.* at 81; April 28 Letter Ex. E at 4). Later, when she realized that CSI expected to be paid extensive damages, Lussier reversed her position after reviewing the TSA and learning that BAC neither needed nor wanted the BankTrade software for long term use. (Lussier Dep. at 70, 83).

ABN argues that whatever *post hoc* conclusions Lussier and Goldfarb may have reached regarding ABN's rights under the License are "either inadmissible or of no probative value." (*See* letter from Mr. Garces to the Court, dated June 17, 2011 ("June 17 Letter"), at 3). In advancing this position, ABN relies principally on *Faulkner v. Nat'l Geographic Soc'y,* 452 F.Supp.2d 369 (S.D.N.Y.2006). (June 6 Letter at 13–14; June 17 Letter at 1). In that case, the

plaintiffs were photographers and writers who sought to recover damages from the National Geographic Society for its allegedly unauthorized reproduction of their work in CD–ROM and DVD form after it previously had appeared with their consent in *National Geographic Magazine*. *Faulkner*, 452 F.Supp.2d at 371–72. In an effort to show that this use went beyond the rights that they had granted to the Society, the plaintiffs cited the favorable deposition testimony of a former Society executive who had drafted the relevant contract language. *Id.* at 378. That executive evidently had concluded that the new formats in which the works were being distributed were "different enough to qualify for additional payments." *Id.* The plaintiffs further relied on evidence that the Society itself had contemplated making additional payments to them. *Id.* In the course of granting partial summary judgment to the Society, Judge Lewis Kaplan rejected this evidence, holding that the subsequent statements and actions of the Society's employees and agents were inadmissible because they were not probative of its intent at the time that the relevant contracts were signed. *Id.* at 379.

In its original cross-motion for summary judgment, ABN argued that the "clear and unambiguous language of the TSA [and PSA] manifests the parties' express intent that ABN's broad global rights to the BankTrade software would remain with ABN and would not be conveyed to [BAC]." (ECF No. 43 (Mem. in Support of Deft's Cross Motion for Summary J.) at 10). That narrow argument was addressed to the face of the PSA and TSA and did not require the Court to consider any course of dealings between BAC and ABN after the October Transaction closed.

ABN also suggested in its papers, however, that the *"actions* of the parties undisputedly establish the parties' intent that the . . . License would remain with ABN." (*Id.* at 9) (emphasis added). Inasmuch as the cross-motions for summary judgment have been withdrawn, (*see* ECF No. 87), this latter argument is not presently before the Court. Moreover, it is unclear precisely what ABN

was alleging. If ABN was contending merely that IBM and Infosys used the BankTrade software in a manner that comported with the requirements of the License and which was consistent with the intent that ABN would be the ultimate licensee, there is nothing in the materials withheld by ABN as work product that need be disclosed on fairness grounds. On the other hand, if by its reference to "actions," ABN seeks to suggest that BAC and ABN both considered the BankTrade License to be ABN's property at all times, including the period immediately after the sale of LaSalle Bank to BAC, its argument may require the disclosure of certain documents (or portions of documents) identified on the ABN privilege log.

As noted previously, the cross-motion that gives rise to these two possibilities was filed more than two years ago, (ECF No. 43), and has been followed by the taking of substantial additional discovery. Moreover, because both sides have withdrawn their prior summary judgment motions, the issues that the parties now believe are relevant may differ from those they previously addressed. Accordingly, rather than speculating about what ABN's prior arguments may have been, the better course is to base a ruling with respect to CSI's "at issue" waiver claim on what ABN's actual contentions are. To that end, the Court will require ABN to state in writing, within ten days, whether it will seek to explain Goldfarb's and Lussier's original statements concerning BAC's ownership of the License by any means other than establishing that neither of them had reviewed the TSA when the statements were made. If ABN commits not to make such further arguments in its motion papers or at trial, CSI's assertion that ABN is unfairly attempting to use its work product documents as both a sword and a shield will have no basis in fact. Alternatively, if there is additional evidence that ABN will seek to introduce in an effort to explain its change in position, the Court will have to consider the extent, if any, to which fairness requires that additional documents identified on ABN's privilege log be disclosed.[5]

5. As ABN concedes, the statements that Goldfarb and Lussier initially made concerning BAC's

ownership of the BankTrade License may well be admissible at trial for impeachment purposes or

### 5. Crime–Fraud Exception

 "[C]ommunications that otherwise would be protected by the ... work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Richard Roe. Inc.*, 68 F.3d 38, 40 (2d Cir.1995) (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir.1984)). To invoke the crime-fraud exception, the party seeking discovery therefore must demonstrate probable cause to believe that (a) "a crime or fraud has been committed or was intended," and (b) the protected "communications were in furtherance thereof." *Id.* When a party establishes a good faith basis for reasonably believing that these requirements can be met, a federal court should conduct an *in camera* inspection of the withheld documents. *United States v. Zolin*, 491 U.S. 554, 574–75, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The requisite showing may be made using "any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged." *Id.* at 575, 109 S.Ct. 2619.

 CSI seeks to establish its good faith basis for believing that ABN engaged in fraud through certain statements that appear on a spreadsheet that ABN and BAC periodically updated to keep track of their ongoing efforts to wean themselves from one another in the manner contemplated by the TSA. (April 28 Letter at 17–18; Kaplan Decl. Ex. I). In that spreadsheet, there are seemingly inconsistent statements indicating (a) that "the lawyers from BAC and RBS both agree that ... BAC can't assign the [License] with-

out consent from CSI," and (b) that "ABN is working with BAC to put forward our position, which is that within the TSA there is an implicit assignment of [the L]icense to [ABN]. Once BAC agrees with [ABN's] position, ABN can approach [CSI]." (Kaplan Decl. Ex. I at 6721). According to CSI, these conflicting spreadsheet entries show that ABN and BAC fabricated a story regarding the ownership of the License in order to defraud CSI. (*See* Apr. 28 Letter at 18). In reality, however, ABN has never denied that it at one point thought that BAC held the License. (*See, e.g.,* June 6 Letter at 6). That ABN originally believed that BAC owned the License, but later abandoned that view is entirely consistent with the testimony of ABN's witnesses. (*See* Goldfarb Dep. at 16; Lussier Dep. at 83). Moreover, my *in camera* review of the contested documents clawed back by ABN fails to sustain the view that ABN was engaged in a scheme to defraud, rather than merely undertaking a fresh and more detailed review of the relevant facts.

CSI therefore is not entitled to the disclosure of any additional documents pursuant to the crime fraud exception to the work product rule.[6]

### B. Attorney–Client Privilege

ABN seeks to withhold only a handful of documents based exclusively on its attorney-client privilege. The Court also must consider whether the Crescenzi email previously discussed constitutes an attorney-client communication. Before turning to these docu-

---

as the admissions of a party-opponent. (*See* June 6 Letter at 14); *see also* Fed.R.Evid. 801(d)(1) (prior statement by witness), 801(d)(2) (admission by party-opponent). On the other hand, any explanation as to why those statements were made would seem to be irrelevant to the key issues in this case, which are whether: (a) it was the original intent of BAC and ABN that the right to use the BankTrade software would remain with ABN; (b) IT's right to use that software was lawfully assigned to ABN pursuant to the TSA; and (c) ABN made any use of the software that exceeded the scope of its licensed rights.

**6.** Even if CSI has failed to show that ABN waived its work product protection, the work

product rule is not absolute. *United States v. Nobles*, 422 U.S. 225, 239, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *In re Initial Pub. Offering Sec. Litig.*, 249 F.R.D. 457, 459 (S.D.N.Y.2008). Accordingly, even if a document constitutes work product within the meaning of Rule 26(b)(3), a party may secure its disclosure upon a showing that it has a "substantial need" therefor and that it cannot obtain the "substantial equivalent" through other means without "undue hardship." Fed.R.Civ.P. 26(b)(3)(A)(ii). In its letters to the Court, CSI has not suggested that it is entitled to disclosure of any of the contested documents on this basis. (*See, e.g.,* April 28 Letter).

150

ments, the Court must first determine the applicable law.

■ A federal court sitting in diversity typically applies state privilege law "with respect to an element of a claim or *defense* as to which [s]tate law supplies the rule of decision." Fed.R.Evid. 501 (emphasis added); *see Bondi v. Grant Thornton Int'l*, No. 04 Civ. 9771(LAK)(HBP), 2006 WL 1817313, at *2 (S.D.N.Y. June 30, 2006) ("In diversity cases, . . . courts must rely on state privilege law."). On the other hand, federal law governs privilege issues in a federal question case with pendent state law claims. *Persky v. Yeshiva Univ.*, No. 01 Civ. 5278(LMM), 2002 WL 31769704, at *2 (S.D.N.Y. Dec. 10, 2002) (citing *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir.1987)).

■ In this action, CSI asserts in its First Amended Complaint that its claims arise under both federal copyright law and the laws of the State of New York. (ECF No. 16 ¶ 1). Accordingly, because "the assertedly privileged evidence is relevant to federal as well as state law claims," the Court must look to federal common law to decide whether ABN may invoke the attorney-client privilege. *See Sequa Corp. v. Gelmin*, No. 91 Civ. 8675(CSH)(MHD), 1993 WL 276081, at *1 (S.D.N.Y. July 16, 1993) (citing Fed.R.Evid. 501).

■ To prevail, ABN consequently must show that "there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Construction Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir.1996). Moreover, each of these three essential elements must be established through competent and specific evidence, not "mere conclusory" assertions. *von Bulow*, 811 F.2d at 146 (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir.1965)).

■ Application of the attorney-client privilege to the corporate context poses "special problems." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). One such problem arises because in-house counsel often serve dual roles as legal advisors and business consultants. *MSF Holding, Ltd. v. Fiduciary Trust Co. Int'l*, No. 03 Civ. 1818(PKL)(JCF), 2005 WL 3338510, at *1 (S.D.N.Y. Dec. 7, 2005); *Ovesen v. Mitsubishi Heavy Indus. of Am. Inc.*, No. 04 Civ. 2849(JGK)(FM), 2009 WL 195853, at *3 (S.D.N.Y. Jan. 23, 2009). Communications that principally involve the performance of non-legal functions by an attorney are not protected. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1037. Moreover, even if a business decision can be viewed as both business and legal evaluations, "the business aspects of the decision are not protected simply because legal considerations are also involved." *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109 (N.D.N.Y.2007) (quoting *Hardy v. N.Y. News, Inc.*, 114 F.R.D. 633, 643–44 (S.D.N.Y.1987)).

■ Here, as noted above, one of the emails sent by Crescenzi (Doc. 14, Item 34) could not be withheld in its entirety on work product grounds because certain of its contents report purely factual matter. Although ABN also claims that this email constitutes an attorney-client communication, there has been no showing that Lussier, Goldfarb, or any other attorney was copied on it. As a result, there is no basis for ABN's claim of attorney-client privilege concerning this document. ABN therefore must turn over this email (but may redact the first paragraph of text on work product grounds).

There are only three emails as to which ABN relies exclusively on the attorney-client privilege. The first of these emails (Doc. 16, Item 37) forwards to Lussier the Crescenzi email considered in the preceding paragraph. Unlike Crescenzi, however, the author of this email specifically requests legal advice. As a consequence, because I have already directed disclosure of the non-privileged portion of the underlying email, ABN need not produce any portion of this email forwarding Crescenzi's email.

The second email (Doc. 20, Item 44) forwards a Lussier email containing legal advice and describes certain steps that Crescenzi is taking in response. The first sentence of the email reflects legal advice and is privileged.

The second sentence does not reflect any legal advice and must be produced.

Finally, the third email (Doc. 26, Item 56) reflects only a business judgment and therefore must be disclosed.

## C. *Depositions*

CSI also maintains that the depositions of ABN witnesses should be reopened so that they can be questioned further regarding any documents that ABN previously improperly withheld and any topics as to which ABN's counsel improperly directed them not to answer on privilege grounds. (April 28 Letter at 19). The limited additional document disclosures required by this Memorandum Decision and Order do not warrant the reopening of any depositions. Similarly, although certain of ABN's counsel's instructions not to answer were overbroad, my review of the deposition transcripts confirms that CSI's counsel had ample opportunity to adduce the relevant information. Accordingly, CSI's request that ABN's witnesses be produced for further questioning at ABN's expense is denied.

## III. *Conclusion*

For the reasons set forth above, CSI's application to compel the production of documents clawed back by ABN is conditionally denied, except to the minor extent detailed above. Additionally, CSI's application to reopen the depositions of ABN witnesses is denied. Finally, counsel are directed to file electronically the letters cited in footnote 1.

SO ORDERED.

