ACE Securities Corp., HOME EQUITY LOAN TRUST, SERIES 2006-HE4, by HSBC BANK USA, NATIONAL ASSOCIATION, in its capacity as Trustee, Plaintiff,

against
DB Structured Products, Inc., Defendant.


653394/2012

Daniel P. Goldberg, Avi B. Israeli, Michael S. Schuster, Hannah S. Sholl, and Daniel M. Sullivan of Holwell, Shuster & Goldberg LLP, for Plaintiff HSBC Bank USA, National Association
David J. Woll, William T. Russell, Isaac M. Rethy, and John A. Robinson of Simpson Thacher & Bartlett LLP, for Defendant DB Structured Products, Inc.


Eileen Bransten, J.

HSBC Bank USA, National Association ("HSBC"), solely in its capacity as trustee for the ACE 2006-HE4 trust (the "Trust"), brought this action against DB Structured Products, Inc. ("DBSP") for breaches of representations and warranties DBSP made about residential mortgage-backed securities contained in the Trust. In Motion Sequence No. 004, Plaintiff moves to compel production of DBSP's internal repurchase analysis documents, which DBSP argues are protected by the attorney-client privilege and the work-product doctrine. In Motion Sequence No. 006, Defendant moves to compel the production of documents that HSBC claims are privileged and protected by the common interest doctrine. Motion Sequence Numbers 004 and 006 are consolidated for disposition. For the reasons that follow, HSBC's motion is granted in part and denied in part, and DBSP's motion is granted in part and denied in part.
I. Background
This action arises from Defendant's sponsorship of a securitization of mortgage-backed loans. (Compl. ¶ 1.) As the sponsor, DBSP initially selected and purchased 3,826 mortgage loans from third-party originators, then sold the loans to the depositor, ACE Securities Corporation ("ACE"), pursuant to a "Mortgage Loan Purchase Agreement" dated September 28, 2006 (the "MLPA"). (Compl. ¶ 40.) ACE then transferred the loans to the Trust in accordance with a Pooling and Servicing Agreement dated as of September 1, 2006 (the "PSA"). (Compl. ¶¶ 22, 40-42.) In the MLPA, DBSP made a series of representations and warranties ("R & W") about the characteristics, quality, and risk profile of the loans. [FN1]
(Compl. ¶ 43.) If the representations and warranties were breached with respect to underlying loans, and such breach materially affected the value of the loans or the interests of the certificateholders, DBSP promised to cure the breach or repurchase the related loans. (Compl. ¶ 44.) In accordance with the PSA, the Trust held the loans for the benefit of certificate-holding investors. (Compl. ¶ 42.)
A. Independent Reviews Reveal Breaches of DBSP's R & W
Before this action was commenced, private certificateholders hired consultants to review 1,652 loans contained in the Trust.[FN2]
(Compl. ¶ 48.) The consultants found 868 breaches of DBSP's representations and warranties that materially and adversely affected the value of the loans, including misrepresentations about borrower income, occupancy status, debt-to-income ratios, loan-to-value ratios, inclusion of high cost loans, and other inaccuracies. (Compl. ¶¶ 47-49.) A second forensic review scrutinized 288 loans. Of those, 187 were found to be in breach DBSP's representations and warranties. (Compl. ¶ 52.)

B. The Instant Action
On September 27, 2012, HSBC filed a summons with notice alleging breaches as to 912 loans—those loans specifically identified by Amherst on behalf of the private certificateholder. (Dkt. No. 1.) On March 4, 2013, after Defendants served a Demand for Complaint, (Dkt. No. 9.), HSBC filed its Complaint asserting causes of action for breach of contract and declaratory judgment, and seeking compensatory and rescissory damages, and specific performance. (Compl. ¶¶ 104-149.) By Order dated April 4, 2014, this Court granted in part and denied in part DBSP's motion to dismiss, allowing Plaintiff's third cause of action for breach of contract to proceed and stating that "Plaintiff's mortgage loan-related recovery is limited to specific performance on loan repurchases or equivalent [*2]damages." (April 4, 2014 Order, Dkt. No. 29, at 11.) The parties moved on to discovery, and the present dispute arose after mutual privilege assertions.
II. Legal Standard Applicable to Both Motions
Generally, "[t]here shall be full disclosure of all matter material and necessary in the prosecution or defense of an action." CPLR § 3101(a). However, CPLR § 3101(d)(2) also recognizes three categories of protected materials, namely: "privileged matter, absolutely immune from discovery; attorney's work product, also absolutely immune; and trial preparation materials, which are subject to disclosure only on a showing of substantial need and undue hardship in obtaining the substantial equivalent of the materials by other means." Spectrum Systems Intern. Corp. v. Chemical Bank, 78 NY2d 371, 376-77 (1991). Since policy favors full disclosure, "the burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its application must be consistent with the purposes underling immunity." Id., at 377 (citations omitted).

III. HSBC's Motion to Compel
HSBC seeks documents related to DBSP's breach analyses. In opposition to the motion, DBSP argues that the documents constitute attorney work product or are protected by the attorney-client privilege. For the reasons that follow, HSBC's motion is granted in part and denied in part.

A. Documents Related Only to Other RMBS Cases
As a preliminary matter, HSBC requests that DBSP produce documents related to this case, as well as documents related to five other residential mortgage-backed securities ("RMBS") cases between the same parties: In re ACE Securities Corp. RMBS Litigation, No. 13-1869-AJN-GWG (S.D.NY), a set of four consolidated RMBS put-back actions, and ACE Securities Corp. Home Equity Loan Trust 2007-HE1 v. DB Structured Prods., Inc., 650327/2013, filed in this court and assigned to Justice Kornreich.

This case, involving solely the ACE 2006-HE4 Trust, proceeded on a parallel schedule with those matters. According to Plaintiff, the parties agreed that documents produced in any case could be used in all cases in order to promote efficiency across all six actions. Defendant argues that the parties agreed to coordinate the matters for deposition purposes only, but that the other cases are now stayed pending settlement discussions. Defendant also notes that Plaintiff fails to explain how documents related solely to trusts in other actions are relevant here.[FN3]

[*3]Defendant concedes there may be documents about "general loan origination standards and practices" that many courts have deemed relevant in RMBS put-back actions, and this Court agrees that they are relevant. See, e.g., Woll Aff., Ex. H (July 9, 2014 Order of Judge Alison Nathan in In re Ace Sec. Corp. RMBS Litig., No. 13 Civ. 1869, Dkt. No. 138.) Beyond those general documents, however, the Court agrees with Defendant that repurchase analysis documents related to specific loans in trusts that are not at issue in this case do not need to be produced. Accordingly, that branch of Plaintiff's motion that seeks documents concerning trusts not at issue in this case is denied. To the extent Plaintiff's motion is granted below, it is only with regards to documents related to the 2006-HE4 Trust.

B. The Breach Analyses and Bulk Demands

1. DBSP's Asset Management Unit
Within its Asset Management unit, DBSP had a "Breach Management" team to handle and address repurchase demands made by certificateholders. See Affirmation of Hannah Sholl in Support of Plaintiff's Motion dated February 1, 2016 ("Sholl Affirm."), Ex. 5. In 2008, the team consisted of twelve analysts—non-lawyers—who operated pursuant to Deutsche Bank's manuals on mortgage loan breaches. See Sholl Affirm. Exs. 6-8. The analysts created separate folders for each individual loan and a master spreadsheet of all reported breaches; both were stored on DBSP's shared computer hard drive. See Sholl Affirm. Ex. 7, at 1783235-47. Based on their analysis of each breach claim, the analysts drafted responses that were also stored in the shared drive. Id.

The Breach Management team was also tasked with uncovering breaching loans before trustees, investors, or anyone else provided a breach notice. With respect to loans that DBSP purchased from originators and placed into securitization pools, DBSP primarily outsourced its loan-level review to external re-underwriters. See Sholl Affirm., Ex. 8. The outsourced breach analyses were uploaded to DBSP's shared drive. See Sholl Affirm., Ex. 8. Then, DBSP's own analysts "validated" the findings, and sent a detailed letter explaining the breach to the originators, a copy of which was also placed in the shared drive. See Sholl Affirm., Ex. 8.
DBSP maintained a Breach Management database called the Collateral Performance System ("CPS"). See Sholl Affirm. Ex. 6. The CPS created an "audit trail" and "allow[ed] an asset's repurchase timeline to be tracked and also allow[ed] other analysts to easily become up to date and knowledgeable regarding an asset." See Sholl Affirm. Ex. 8, at 187980-81. The CPS also included a "Breach Analysis Detail" section [*4]that included analysts' evaluation of the breach claims. See Sholl Affirm. Ex. 8. The CPS could generate several reports, including a "Breach In Analysis Review" with internal comments and correspondence between DBSP and the entity that sent the breach notice. Sholl Affirm., Ex. 12. All documents generated by DBSP's internal and external reunderwriters are collectively referred to herein as "Breach Analyses."
 2. The Bulk Repurchase Demands
DBSP received the first bulk repurchase demand from Amherst on November 21, 2011 (the "Bulk Demands"). (Aulisa Opp'n Aff., ¶ 20.) This demand was different from previous Breach In demands because it came from a distressed debt investor and involved hundreds of loans, far more than a typical Breach In demand. Id. The investor was also represented by litigation counsel. Id.
DBSP asked Latham & Watkins LLP ("Latham"), who was already representing it in connection with unrelated litigation, to advise it in connection with the Amherst Bulk Demands. Id., ¶ 21. In December 2011 and January 2012, Latham retained consultants to review the Bulk Demands, and Defendant contends that Latham and the consultants "had calls and meetings so that counsel could provide advice and direction on how to assess the alleged R & W breaches." Id., ¶ 22. The re-underwriting consultants worked closely with Latham and DBSP personnel to "assess which loans were and were not eligible for repurchase, based on various legal arguments and defenses." Id., ¶ 24. Thus, DBSP argues that the Breach In process was significantly different after the receipt of the first Amherst Bulk Demand. Id., ¶¶ 30-31. DBSP contends that its litigation counsel's involvement demonstrates that its documents were prepared in anticipation of litigation.

3. Documents Sought by HSBC
According to Plaintiff, DBSP has withheld virtually all of its Breach Analyses, including CPS documents and reports. (Pl. Supp. Br. at 7-8.) Additionally, DBSP has provided undated spreadsheets containing loan information, but redacted information in "Comments" columns. (Sholl Affirm., Ex. 15.) Plaintiff also complains that DBSP withheld several email attachments and identified them on its privilege log as "prepared in anticipation of litigation related to repurchase requests." (Pl. Supp. Br. at 8-9.)
C. Work-Product Doctrine 
HSBC argues that the Breach Analyses are not protected by the work-product [*5]doctrine because they were created in the ordinary course of business pursuant to DBSP's contractual obligations. DBSP contends that its documents should not be disclosed because they were created in anticipation of litigation. For the reasons that follow, the Court determines that DBSP's Breach Analysis documents must be produced.
1. Work-Product Decisions in RMBS Cases
To establish that the Breach Analyses are protected work product, DBSP must demonstrate that the documents were "primarily prepared in anticipation of litigation and are, thus, privileged matter." MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 93 AD3d 574, 574 (1st Dep't 2012). In MBIA, the First Department held that Countrywide's repurchase review documents were discoverable because "processing repurchase requests was an inherent and long-standing part of defendants' business." Id., at 575. It did not matter that defendant had created a new division to respond to plaintiff's requests, "or that litigation appeared imminent," because the defendants were "contractually obligated" to conduct repurchase reviews and such reviews were conducted by non-lawyers. Id. Other courts have similarly held that even where counsel provides advice about "how to respond to repurchase requests," that can be, in effect, giving advice "about how to conduct the ordinary course of [defendant's] business." Deutsche Bank Nat. Trust Co. v. WMC Mortgage, LLC, 2015 WL 1650835, at *15 (D. Conn. Apr. 14, 2015); accord Home Equity Mortg. Trust Series 2006-1 v. DLJ Mortg. Capital, Inc., 2014 WL 3615671, at *3 (Sup. Ct. NY Cnty. 2014) (RMBS repurchase analyses not privileged because defendant was contractually obligated to perform the reviews and they had a long-standing business practice for handling repurchase demands).
2. MBIA Governs This Dispute
To escape the application of MBIA, Defendant argues that the First Department erroneously analogized a bank's breach analyses to an insurer's claims processing reports prepared before a breach, which are discoverable. See Def. Supp. Br. at 12-15; see also MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 93 AD3d 574, 575 (1st Dep't 2012) (citing Brooklyn Union Gas Co. v. American Home Assur. Co., 23 AD3d 190, 191 (1st Dep't 2005)). Defendant argues that its Breach Analyses cannot be "ordinary course" documents because its ordinary course cannot be to breach agreements then investigate those breaches. (Def. Opp'n Br. at 12-14.) Defendant also argues that in 2015, the Court of Appeals held that breach analyses were a "procedural prerequisite to suit," and therefore they necessarily constitute documents created in anticipation of litigation. ACE Securities Corp. v. DB Structured Products, Inc., 25 NY3d 581, 589 (2015).
Defendant's distinction is strained and unpersuasive, and the same arguments were recently rejected by the First Department. See Bank of New York Mellon v. WMC Mortgage, LLC, 140 AD3d 585, 585 (1st Dep't 2016) ("Whether the documents were [*6]prepared before or after WMC's alleged breach is not dispositive as to whether they were created for a business or litigation purpose.") The First Department also confirmed that ACE's characterization of repurchase obligations as "procedural prerequisites to suit" does not render a bank's ordinary course repurchase analyses "litigation documents." Id., at 585-86. Thus, MBIA governs this dispute.
3. Defendant's Breach Analyses Are Not Work Product
At the outset, the Court agrees with Plaintiff that DBSP implicitly concedes that all the Breach Analyses and documents created before it hired Latham in November 2011 must be produced, because Defendant had a long-standing practice of conducting reviews pursuant to its internal policies. Defendant must turn over all of its Breach Analyses that preceded its retention of Latham.
Defendant's Breach Analyses prepared after hiring Latham must also be produced. Defendant has failed to establish that its Breach Analyses were "primarily prepared in anticipation of litigation." MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 93 AD3d 574, 574 (1st Dep't 2012). First, Defendant argues that the documents created after November 2011 constitute work product because they were created by newly hired re-underwriting consultants at the direction of Latham. But hiring Latham in 2011 because litigation appeared "imminent" did not transform Defendant's long-standing practice of repurchase analysis into work product because the Defendant remained contractually obligated to conduct repurchase reviews. MBIA Ins. Corp., 93 AD3d at 575. Nor does the fact that Latham hired new consultants to assist in repurchase analyses require a finding that their documents constituted work product performed in anticipation of litigation. Id. ("That a new division was created to respond to plaintiff's repurchase requests is of no moment "); see also Deutsche Bank Nat. Trust Co. v. WMC Mortgage, LLC, 2015 WL 1650835, at *20 (D. Conn. April 14, 2015) ("The mere fact that outside counsel and consultants were retained to assist the repurchase review is insufficient to shield all of the repurchase documents from discovery.") (citation omitted). 
Additionally, Defendant contends that the analyses were created primarily for litigation purposes because DBSP had already exited the mortgage securitization business. (Def. Opp'n Br. at 17.) Defendant relies on two discovery decisions in FHFA v. HSBC N. Am. Hldgs. Inc., where the court determined that certain documents reflected counsel's assessments of the legal merit of repurchase demands and could be withheld. See FHFA v. HSBC N. Am. Holdings, Inc. ("HSBC I"), 2014 WL 1327952, at *2 (S.D.NY Apr. 3, 2014); see also FHFA v. HSBC N. Am. Holdings, Inc. ("HSBC II"), 2014 WL 1909446, at *1 (S.D.NY May 13, 2014). DBSP makes much of that court's statement that the defendant there had created its documents "following its exit from the mortgage securitization business," and argues that DBSP is similarly situated. HSBC II, 2014 WL 1909446, at *1. However, HSBC II stands for the unexceptional proposition that documents that "reflect counsel's assessments of the legal merit of repurchase demands [*7]may be withheld." Id. In fact, the court specifically requested a supplemental submission regarding whether counsel had actually provided legal advice. HSBC I, 2014 WL 1327952, at *2. Hence, the salient fact was not that defendant had exited the RMBS business,[FN4]
 but that the documents reviewed by the court actually constituted legal 
assessments.
Separately, the HSBC I & II court actually rejected the same blanket privilege assertion that Defendant seeks to assert here. The court explicitly stated that "the kinds of documents that were routinely prepared before April 2011 by business personnel for use by business personnel in connection with decisions about the repurchase of loans would not be protected by the work-product privilege simply because that task was transferred to personnel within the legal department." HSBC I, 2014 WL 1327952, at *2. DBSP's reliance on HSBC I & II is therefore misguided.
DBSP next argues that its lawyers' involvement in the repurchase reviews significantly changed the format and nature of the Breach Analyses. However, the record before the Court does not point to a significant change in the documents generated by DBSP and its consultants. DBSP relies on its officer's statements that the review process following the Bulk Demands "was different than the process [DBSP] had previously used for Breach In demands." (Aulisa. Aff. ¶ 23.) But DBSP's reviews continued to be performed by non-lawyers even after 2011, highlighting that they "are not legal in nature." Home Equity Mortg. Trust Series 2006-1 v. DLJ Mortg. Capital, Inc., 2014 WL 3615671, at *3 (Sup. Ct. NY Cnty. 2014). Furthermore, the documents prepared before December 2011 contain many of the same elements that were supposedly introduced by Latham in 2012, undermining Defendant's contention that the repurchase analyses were significantly changed. (See Suppl. Sholl Aff., Ex. 34.)

Put simply, DBSP had a long-standing business practice of conducting Breach Analyses; just as in MBIA, neither the introduction of lawyers nor the fear of imminent litigation converted that business function into work product because it continued to be performed by non-attorney underwriters pursuant to the Defendant's contractual obligations. MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 93 AD3d 574, 575 (1st Dep'1 2012). Defendant cannot withhold its Breach Analyses under the work product doctrine.
D. Attorney-Client Privilege
Next, DBSP argues that it properly asserted the attorney-client privilege regarding [*8]its Breach Analyses, emails, and other documents. Plaintiff contends that the privilege does not extend to these documents because they are business—not legal—communications. 
The attorney-client privilege shields from disclosure any confidential communications between an attorney and a client made for the purpose of obtaining or facilitating legal advice in the course of a professional relationship. CPLR 4503(a)(1); see also Ambac Assur. Corp. v. Countrywide Home Loans, Inc., 27 NY3d 616, 623-24 (2016). The privilege must be narrowly construed because it is at odds with the general policy of this State favoring liberal discovery, and the party asserting the privilege bears the burden of establishing that it applies. Ambac Assur. Corp., 27 NY3d at 623-24 (citing Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 NY2d 371, 377 (1991)). The proponent must establish that the communication was between an attorney and a client, for the purpose of rendering legal advice or services, in the course of a professional relationship, and that the communication was confidential and the privilege was not waived. Id. (citing Rossi v. Blue Cross & Blue Shield of Greater NY, 73 NY2d 588, 593-94 (1989)). While the privilege is intended to protect confidential communications related to legal matters, it does not extend to "business or personal communications." Rossi, 73 NY2d at 593.
1. The Breach Analyses Are Not Privileged 
As noted above, the Breach Analyses concern business judgments and were prepared by non-lawyers performing a regular business function. These documents are the same types of "retroactive analyses" to which the attorney-client privilege does not apply. Assured Guar. Mun. Corp. v. UBS Real Estate Sec. Inc., 2013 WL 1195545, at *9 (S.D.NY Mar. 25, 2013); see also Syncora Guarantee Inc. v. EMC Mortgage Corp., 2013 WL 2552360, at *4 (N.D. Cal. June 10, 2013) ("[E]ven those communications that included attorneys were not privileged because they related to ordinary business matters and were predominantly business advice."). Accordingly, the Court determines that the Breach Analyses are not protected by the attorney-client privilege.
Defendant also contends that certain communications about the breach analyses or the bulk demands either "explicitly reflect or seek legal advice," or were sent to counsel to keep them apprised of ongoing litigation. (Def. Opp'n Br. at 24.) But the Court has rejected DBSP's argument that these breach analyses constituted a legal function. Moreover, "to the extent an attorney is making a judgment about the probability of a loan requiring repurchase," that judgment does not necessarily constitute legal advice. Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings, Inc., 2014 WL 1327952, at *2 (S.D.NY 2014). DBSP has also withheld communications between non-lawyers based on the theory that such communications may reflect the advice of counsel or incorporate legal concepts. Again, Defendant must produce those communications that were withheld based solely on Defendant's contention that they are categorically protected. 
2. Emails and Attachments Are Not Categorically Privileged
DBSP has also withheld attachments to certain emails that it claims are privileged. DBSP argues that the documents expressly discuss litigation, analyze legal claims, or consist of drafts of confidential legal documents. Even if the emails themselves were privileged, "[t]o the extent that the request for advice attaches business records created in the ordinary course of business, those business records do not become privileged because copies are also sent to counsel in connection with a request for advice." HSBC I, 2014 WL 1327952, at *3 (S.D.NY 2014). Accordingly, underlying business documents withheld by DBSP solely because they were attached to privileged communications must also be produced.
Though DBSP may actually be in possession of certain email communications in which legal advice was sought or communicated, its "broad claim[] of attorney-client privilege for communications regarding the analysis of repurchase demands" must be rejected. Syncora Guarantee Inc. v. EMC Mortgage Corp., 2013 WL 2552360, at *3 (N.D. Cal. 2013) (citing MBIA, 93 AD3d at 575). As Plaintiff recognizes, DBSP may be in possession of emails or documents that actually reflect confidential information between DBSP and its attorneys in which legal advice was sought or communicated. (Pl. Supp. Br. at 24.) DBSP may provide an updated privilege log consistent with this Decision.
 E. Conclusion
Plaintiff requests specific relief for certain categories of documents, which the Court grants in part to the extent such documents are specifically related to the 2006-HE4 Trust, and in accordance with the standards outlined above. DBSP must produce: (1) all spreadsheets, reports, memoranda, presentations, and other documents containing commentary and analyses of potential breaches, including commentary and analyses prepared by DBSP and third-party vendors; (2) factual material DBSP considered as part of its repurchase analyses, such as re-verifications of income or employment, pay stubs, and credit reports; (3) emails pre-dating the breach notices that were not sent to or from attorneys and do not reflect legal advice; (4) emails post-dating the breach notices that were not sent to or from attorneys and do not reflect legal advice; and (5) emails that were sent to or from attorneys, but were withheld under DBSP's categorical privilege assertion over all documents related to Breach Analyses and do not actually reflect legal advice specifically directed to litigation strategy or litigation defenses.[FN5]

DBSP need not produce documents that are not relevant to the securitization at issue here, and to the extent it possesses and withholds documents containing specific communications with counsel in which legal advice was sought or communicated based on privilege, it must produce an updated privilege log consistent with this Decision.

IV. DBSP's Motion to Compel
DBSP seeks to compel production of three categories of documents. First, Plaintiff has withheld communications between it and certificateholders, including Amherst, concerning the repurchase demands ("Repurchase Communications") on the basis of the common interest doctrine. Plaintiff has also withheld dozens of communications concerning loan servicing issues ("Servicing Communications"), which Defendants argue constitute routine business communications and are therefore not protected. Finally, Plaintiff withheld or redacted emails sent to group email lists, despite being unable to identify the lists' members.
A. The Repurchase Communications
First, DBSP moves to compel communications regarding repurchase demands between Amherst and HSBC that predate September 26, 2012, which is when Amherst and HSBC entered into a Confidentiality and Indemnification Agreement (the "C & I Agreement") agreeing to pursue this litigation. DBSP also seeks HSBC communications exchanged with other certificateholders before they agreed to pursue litigation. DBSP does not dispute that these communications are protected,[FN6]
 but argues that HSBC waived any privilege by "sharing information with certificateholders like Amherst." (Def. Supp. Br. at 6.) HSBC argues that under the common interest doctrine, these communications remain protected even if they were shared.
1. Legal Standard — Common Interest Doctrine

As noted above, privilege assertions must be narrowly construed because they are at odds with the general policy of this State favoring liberal discovery, and the party asserting the privilege bears the burden of establishing that it applies. Ambac Assur. Corp. v. Countrywide Home Loans, Inc., 27 NY3d 616, 624 (2016) (citing Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 NY2d 371, 377 (1991)). The proponent must also establish that [*9]the communication was confidential and that the privilege was not waived. Id. (citing Rossi, 73 NY2d at 593-94 (1989)). The last two requirements—confidentiality and waiver—become relevant when third parties learn about the communication. Generally, a client waives the privilege if a communication is subsequently revealed to a third party. Ambac Assur. Corp., 27 NY3d at 624.
However, the "common interest exception" may protect any attorney-client communication where—as here—it is exchanged by two clients that retain separate counsel. Id. Such communication "remains privileged if the third party shares a common legal interest with the client who made the communication and the communication is made in furtherance of that common legal interest." Id., at 620. The doctrine does not require "a total identity of interest among" the parties. GUS Consulting GMBH v. Chadbourne & Parke LLP, 20 Misc 3d 539, 542 (Sup. Ct. NY Cnty. 2008) (citing Eugenia VI Venture Holdings, Ltd. v. Chabra, 2006 WL 1096825, at *1 (S.D.NY 2006)). The common interest doctrine has protected documents shared by parties "facing common problems in pending or threatened civil litigation." Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's London, 176 Misc 2d 605, 611 (Sup. Ct. NY Cnty. 1998), aff'd sub nom. Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's, 263 AD2d 367, 367 (1st Dep't 1999). The determination of whether two parties share a common legal interest cannot be made categorically, N. River Ins. Co. v. Columbia Cas. Co., 1995 WL 5792, at *4 (S.D.NY 1995), and cannot be based solely on their relationship. Mt. McKinley Ins. Co. v. Corning Inc., 2009 WL 6978591, at *8 (Sup. Ct. NY Cnty. 2009).
Indeed, the privilege may exist despite an adversarial relationship between the two parties asserting it. Id. (citing 330 Acquisition Co., LLC v. Regency Sav. Bank, F.S.B., 12 AD3d 214, 214 (2004)); see also In re Megan-Racine Associates, Inc., 189 B.R. 562, 572 (Bankr. N.D.NY 1995) (even where a subsequent lawsuit is foreseeable between two parties, that does not prevent them from sharing confidential information for the purpose of a common interest). "What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal." Microsoft Corp. v. Acacia Research Corp., 2014 WL 6450254, at *3 (S.D.N.Y 2014). The Court of Appeals recently confirmed that "any such communication must also relate to litigation, either pending or anticipated, in order for the exception to apply." Ambac Assur. Corp., 27 NY3d at 620.
2. A Common Legal Interest

First, HSBC must show that it shared a "common legal interest" with the certificateholders, and that the challenged communications related to that common [*10]interest. Ambac Assur. Corp., 27 NY3d at 620.[FN7]
Defendant argues that there was no common interest prior to the C & I Agreement or the other certificateholders' agreements because: (i) HSBC took no position as to the merits of the repurchase demands; (ii) HSBC refused to commence litigation until it received notice, direction, and what it determined—in its sole discretion—to be adequate indemnity; and (iii) HSBC and certificateholders have divergent views of their respective rights and obligations with respect to repurchase demands, as evidenced by pending class action suits in which some certificateholders claim that HSBC violated its obligations to pursue repurchase demands. (Def. Supp. Br. at 12-13.)
HSBC argues that it communicated with certificateholders regarding the repurchase demands to coordinate a legal strategy regarding how to enforce the rights of the Trust under the relevant transaction documents. The Court determines that this is a sufficient common legal interest to protect its communications.
As noted above, a common legal interest need not be identical. Rather, the privilege "applies where an interlocking relationship' or a limited common purpose' necessitates disclosure to certain parties." GUS Consulting GMBH v. Chadbourne & Parke LLP, 20 Misc 3d 539, 542 (Sup. Ct. NY Cnty. 2008). Here, the communications regarding repurchase demands were exchanged in furtherance of HSBC and the certificateholders' legal strategy to put back defective loans to DBSP. In re Velo Holdings Inc., 473 B.R. 509, 514 (S.D.NY Bankr. 2012) ("The rationale for the doctrine is that it permits persons who have common interests to coordinate their positions without destroying the privileged status of their communications with their lawyers.") (internal quotations omitted). Their joint desire to put back defective loans constituted a common legal interest, and exchanging communications regarding the repurchase demands was necessary to coordinate their position against DBSP. See Ambac Assur. Corp., 27 NY3d at 628 ("When two or more parties are engaged in or reasonably anticipate litigation in which they share a common legal interest, the threat of mandatory disclosure may chill the parties' exchange of privileged information and therefore thwart any desire to coordinate legal strategy.").

This "limited common purpose" is not vitiated simply because HSBC and Amherst may have been at odds with regards to other issues like the threshold vote by a percentage of certificateholders, or whether HSBC was provided sufficient indemnification. It is also not affected by the fact that HSBC and Amherst may have had divergent views about their obligations under the transaction documents or whether HSBC could decline to file the lawsuits. HSBC and Amherst exchanged the communications to coordinate their legal strategy to put back defective loans, even if they may have been at odds vis-à-vis other [*11]issues. See 330 Acquisition Co., LLC v. Regency Sav. Bank, F.S.B., 12 AD3d 214, 214 (1st Dep't 2004) (finding that a common legal interest existed between a creditor and debtor); see also GUS Consulting GmbH, 20 Misc 3d at 542 (an identical interest is not required to protect documents from disclosure). Accordingly, the Court determines that communications related to repurchase demands concern a "common legal interest" between Amherst and HSBC.
3. Pending or Anticipated Litigation

In addition to sharing a common legal interest and making the communications "in furtherance of that common legal interest," the communications may only be withheld if they "also relate to litigation, either pending or anticipated." Ambac Assur. Corp., 27 NY3d at 620. In Ambac, the Court of Appeals determined that communications regarding a forthcoming merger between two parties had to be produced because they did not concern anticipated litigation regarding the merger. Id., at 632. But here, DBSP "does not contend that Plaintiff's assertion of common interest protection with respect to communications that pre-date the C & I Agreements fails because litigation was not pending or anticipated." (Def. Reply Br. at 6.)[FN8]
 Moreover, the concerns of abuse expressed by the Court of Appeals are 
not present here, because HSBC and the certificateholders do not share a 
commercial interest regarding the repurchase demands. See Ambac Assur. Corp., 27 
NY3d at 629 (explaining that the Court sought to "safeguard against 
separately-represented parties who seek to shield exchanged communications from 
disclosure based on an alleged commonality of legal interest but who have only 
commercial or business interests to protect.") Accordingly, the repurchase 
communications between HSBC and certificateholders regarding repurchase demands 
were related to anticipated litigation.
For the foregoing reasons, the Court determines that the communications between the certificateholders and HSBC regarding repurchase demands were properly withheld pursuant to the common interest doctrine.[FN9]

[*12]B. The Servicing Communications
DBSP also seeks to compel communications between HSBC, Ocwen Loan Servicing LLC, Wells Fargo, and other third parties relating to loan servicing issues. These documents have been withheld as "communications regarding a legal notice," or "communications regarding a foreclosure proceeding." (Def. Supp. Br. at 19.) Plaintiff argues these communications are privileged because they are primarily legal in nature.
Several courts have considered whether the loan servicing business enjoys broad immunity from discovery because it implicates matters of property law and sometimes involves litigation. One court noted the difficulty in finding the dividing line between facts regarding the foreclosure and privileged communications, and ordered an in camera review of foreclosure related documents. See Roberts v. U.S. Bank, Nat. Ass'n, 2014 WL 3510573, at *4 (D. Mass. 2014). Ultimately, the Roberts court found that several documents had to be produced because they did not "reflect or implicate any legal advice" and were not "made in anticipation of litigation." Roberts, 13-cv-11142, Dkt. No. 59, at 17. HSBC complains that the Roberts court was not applying New York law, but fails to point to any New York authority that has permitted the categorical withholding of similar foreclosure-related communications. Moreover, HSBC does not dispute that many of the communications it has withheld were neither sent nor received by an attorney.
Accordingly, the Court determines that Plaintiff has not shown that the servicing communications are categorically privileged. Plaintiff must produce these documents to the extent that they do not actually reflect or implicate any legal advice and were not made in anticipation of litigation. Plaintiff may provide an updated privilege log if it claims that some of these communications reflect legal advice.
C. Group E-Mail Lists

Finally, DBSP seeks production of messages sent by Plaintiff to group email lists. Plaintiff cannot identify who all the individual members of these lists were at the time the messages were sent. Defendant argues that it is therefore impossible to determine whether these messages were shared "in a manner that defeats or waives any privilege." (Def. Br. Supp. at 22.) Plaintiff argues that it has provided sufficient information to allow the Court to make a determination as to privilege, but acknowledges that it would be impossible to determine who the individual members of the lists were.
In Wultz v. Bank of China Ltd., the court considered whether messages sent to a "group email address" could be withheld. 2013 WL 6098484, at *2 (S.D.NY Nov. 20, 2013). Noting that the burden rests on the party asserting the privilege, the court determined that "[t]he mere assertion that communications came from a group email [*13]address used by a department that included licensed lawyers is not sufficient." Id. Here, Plaintiff argues that several email address lists' names—e.g., CTSLitManagement&commat;wellsfargo.com—suggest that they involved litigation and contained lawyers. As in Wultz, this assertion is insufficient to support Plaintiff's privilege assertion, and these messages must be produced.

V. Conclusion

For the foregoing reasons, it is hereby:
ORDERED that Defendant's motion to compel disclosure is GRANTED IN PART and DENIED IN PART; and it is further
ORDERED that Plaintiff's motion to compel disclosure is GRANTED IN PART and DENIED IN PART; and it is further
ORDERED that Plaintiff and Defendant produce documents and/or serve updated privilege logs consistent with this Decision within twenty (20) days.
This constitutes the decision and order of the Court.
Dated: New York, New York
October 12, 2016
ENTER:
Hon. Eileen Bransten, J.S.C.



Footnotes


Footnote 1: The PSA also incorporates the express representations and warranties set forth in the MLPA. (Compl. Ex. B §§2.01, 2.03.)

Footnote 2: Amherst Advisory & Management, LLC ("Amherst") acted as manager of the private certificateholders' stake in the Trust. (Compl. ¶ 23.)

Footnote 3: Plaintiff argues that the documents are relevant because they concern "DB's process for reunderwriting defective loans, its interpretation of applicable representations and warranties, and how it decided whether to repurchase or put back breaching mortgage loans." (Pl. Reply. Br. at 4-5.) The Court declines to consider these arguments because they were raised for the first time in Plaintiff's Reply Brief. 
 PK Rest., LLC v. Lifshutz, 138 AD3d 434, 438 (1st Dep't 2016).


Footnote 4: As stated by another court, whether Plaintiff remains in the RMBS business is irrelevant. See Syncora Guarantee Inc. v. EMC Mortgage Corp., 2013 WL 2552360, at *4 (N.D. Cal. 2013) (applying New York law and citing MBIA). The pertinent inquiry is "whether the analysis of the repurchase demands was a part of the ordinary business of the company," regardless of whether it has begun to wind down its mortgage securitization business. Id.



Footnote 5: "The Trustee does not request that DB produce memoranda, presentations, or reports
prepared by DB's attorneys that are specifically directed to litigation strategy or litigation defenses." (Pl. Supp. Br., at 25.)


Footnote 6: In a footnote in its reply brief, DBSP argues that it does not concede that Plaintiff's communications with Amherst and other certificateholders constitute privileged materials. (Def. Reply Br. at 3, n.2.) However, at oral argument, Defendant acknowledged that the materials were privileged and conceded that its position is that any privilege was waived when the information was shared. (March 30, 2016 Hrg. Tr., at 37:11-38:7.)



Footnote 7: Ambac provides no instruction on this portion of the analysis. There, the Court of Appeals explicitly declined to opine on "what it means to share common legal interests," holding only that "litigation must be ongoing or reasonably anticipated, and the exchanged communication must relate to it." Ambac Assur. Corp., 
27 NY3d at 630, n.4.


Footnote 8: In the SDNY action, Defendant conceded that the documents at issue concern pending or anticipated litigation: "Plaintiff's assertion of the common-interest doctrine, however, is unsustainable not because the communications do not concern pending or threatened litigation (they do), but rather because the parties to those communications had no agreement to pursue a common legal strategy at the time they were made." (Defendant's Reply Memorandum of Law, In re Ace Securities Corp. RMBS Litigation, 13-cv-1869, Dkt. No. 158, at 11, n.5.)


Footnote 9: DBSP also argues that HSBC has improperly withheld communications regarding "certificateholder voting rights in connection with a notice and request for direction in connection with repurchase demands." (Def. Supp. Br. at 17.) DBSP argues that with regards to voting rights, the parties were "merely performing a business function pursuant to their obligations under the PSAs." Id., at 18. The Court agrees and grants DBSP's motion to compel these documents, although Plaintiff claims that it already produced them. (Pl. Opp'n Br., at 4 n.4.)